**FIRST ENTERPRISE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 04–0082C.

United States Court of Federal Claims.

June 25, 2004.

Jeffrey I. Gdanski, Gdanski & Gdanski LLP, Teaneck, New Jersey, argued for plaintiff.

Richard Ewing, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for defendant.

## OPINION AND ORDER

BLOCK, Judge.

### I.  INTRODUCTION

To what degree may a court interfere with an administrative agency's budgetary process in a construction project?  That is the dilemma facing the court when deciding the issues arising in this post-award bid protest case. Plaintiff, First Enterprise, challenges the U.S. Department of Veterans Affairs ("agency" or "VA") award of a contract to DJM Construction Co., Inc. ("DJM") for the construction of a specialty clinic at the VA Greater Los Angeles Healthcare Center.

Plaintiff essentially contends that the VA did not allocate sufficient funds for its construction project because it unlawfully ignored an independent cost estimate, and that plaintiff's wrongly-rejected bid gave the agency the best value. Among other things, the plaintiff asks the court to enjoin the agency from awarding the contract to another bidder. The defendant counters that the agency acted reasonably in all respects. This controversy thus implicates the role of the judiciary—Hamilton's "least dangerous branch"—in the modern world of administrative agency enforcement of congressional spending mandates.

Before the court are the parties' cross-motions for summary judgment on the administrative record pursuant to Rule 56.1 of the Rules of the Court of Federal Claims ("RCFC") and plaintiff's petition for a permanent injunction. The parties completed briefing on April 26, 2004, and oral argument on the motions was held on June 9, 2004. This court has jurisdiction under the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874–75 (1996), which amended the Tucker Act to provide this court with jurisdiction to entertain post-award bid protests. After carefully reviewing the parties' briefs and after oral argument, the court grants summary judgment in favor of the government and denies plaintiff's cross motion and petition for injunctive relief.

## II. BACKGROUND

The facts in this case derive from the administrative record. On August 6, 2003, the Los Angeles branch of the VA issued solicitation No. 600–249–03RT ("Solicitation") for the consolidation and relocation of Prosthetic Treatment Center, Optometric Clinic, and Ophthalmology Clinic into building No. 304, for the VA Greater Los Angeles Healthcare Center. The procurement was set aside for 8(a) minority contractors through an invitation for bids ("IFB") and all offers were sealed. Admin. R. at 36. The IFB required bidders to submit offers for the main item bid, as well as offers for five alternate bid items. The main bid item consisted of "general construction, alterations, mechanical and electrical work, laboratory equipment, utility systems, [and] necessary removal of existing structures," and the alternate bid items progressively deducted portions of the work from the main bid item. *Id.* at 38.

In requesting funding for the project, the agency used its own construction estimate of $3,218,781 ("construction estimate") and added 7.5% for construction contingency costs, $50,000 for impact costs and $406,394 for estimated architect/engineering fees. Admin. R. at 3. The agency submitted a project funding request for $3,916,584 ("agency estimate") and received an allocation in that amount for the project budget. Admin. R. at 126. The agency then spent $366,000 on the design of the project, leaving $3,551,000 available for construction. Admin. R. at 164 (11:18:36 to 11:19:02). Prior to issuing the Solicitation for the construction portion of the project, however, the agency hired C.P. O'Halloran Associates, Inc. to develop an independent government estimate ("O'Halloran estimate") for the project construction. This estimate listed construction costs at $3,596,111. Admin. R. at 5.

With the $3,551,000 remaining in its project budget, the agency issued the Solicitation and received bids from four offerors: First Enterprise, Ace Engineering, Inc. ("Ace"), DJM and Stronghold Engineering, Inc. Admin. R. at 44–45. Although the agency based its request for funding on its own construction estimate of $3,218,781 plus contingency, impact and design costs, the agency used the O'Halloran estimate of $3,596,111 to review the bids. Admin. R. at 44. After publicly opening the bids, the agency chose the low bid for alternate bid item 5, submitted by Ace. A short time after the agency designated Ace the awardee, Ace asked to withdraw its bid because Ace had made clerical errors in its calculations. *Id.* at 54. The agency investigated Ace's request, determined that Ace's bid contained an error and permitted Ace to withdraw from the procurement. *Id.* at 72–73.

Although First Enterprise became the low bidder for each bid item after Ace's withdrawal, it is important to note that its bid for each alternate bid item exceeded the

$3,551,000 remaining in the project budget.[1] Since all offers were above both the remaining allocated amount of $3,551,000 and the O'Halloran estimate, the agency deemed the bids "unreasonable" and converted the Solicitation from an IFB to a request for proposals ("RFP"), which was to be negotiated. *Id.* at 79, 84. The construction requirements for the RFP remained the same; however, the agency amended the Solicitation to include a sixth alternate bid item to help ensure award of the contract. *Id.* at 75.

On September 26, 2003, after reviewing the proposals from the three remaining companies, the agency awarded the contract to the lowest offeror, DJM, for its bid of $2,989,000 on alternate bid item 6.[2] Then, on October 3, 2003, plaintiff filed a bid protest action with the General Accounting Office ("GAO"). After GAO denied plaintiff's petition, plaintiff filed a post-award bid protest in this court on January 22, 2004. A scheduling order was issued on January 28, 2004. This court then conducted a telephone conference with representatives of First Enterprise and the government, in which plaintiff withdrew its petition for a preliminary injunction, as well as its motion for expedited and expanded discovery. Order, February 4, 2004. This court also granted leave for plaintiff to file a first amended complaint, and requested the parties to submit motions for summary judgment in accordance with RCFC 56.1.

## III. STANDARDS

### A. *Jurisdiction and Standard of Review*

The Court of Federal Claims has jurisdiction, pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2003), "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." The standard of review is whether the procuring agency's conduct was arbitrary and capricious. *See* 28 U.S.C. § 1491(b)(4) (2003) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").[3] Regarding this standard, the Supreme Court has stated that:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a con-

1. First Enterprise bid $3,844,495 for the main bid item; $3,814,845 for alternate bid item 1; $3,708,985 for alternate bid item 2; $3,760,985 for alternate bid item 3; $3,752,345 for alternate bid item 4; and $3,680,895 for alternate bid item 5. Admin. R. at 44. O'Halloran estimated $3,596,111 for the main bid item; $3,566,111 for item 1; $3,556,111 for item 2; $3,513,111 for item 3; $3,494,111 for item 4; and $3,471,111 for item 5. *Id.* Thus, First Enterprise's bids also exceeded the O'Halloran estimate for each bid item.

2. The agency did not permit Ace to re-bid on the project after it withdrew its initial offer. Admin. R. at 74. DJM bid $3,796,000 for item 5 and $2,989,000 for item 6. First Enterprise bid $3,613,986 for item 5 and $3,110,216 for item 6. O'Halloran estimated $3,471,111 for item 5 and $3,121,111 for item 6. Admin. R. at 102. First Enterprise's bid for item 5, exceeded both the O'Halloran estimate and the $3,551,000 remaining in the project budget.

3. The full text of Section 706 of The APA provides:
   > To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ...
   > (2) hold unlawful and set aside agency, action, findings, and conclusions found to be—
   > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
   > (B) contrary to constitutional right, power, privilege, or immunity;
   > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
   > (D) without observance of procedure required by law;
   > (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
   > (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
   > In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

sideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir. 2000).

▇ Under the APA standard, "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of a regulation or procedure." *Banknote Corp. of America v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004)(quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001)); *see also Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996). In determining whether the agency's actions were arbitrary and capricious, the court's inquiry must focus on whether the agency "examined the relevant data," *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), and "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *Banknote Corp. of America,* 365 F.3d at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi,* 238 F.3d at 1332–33). "The [a]rbitrary and capricious standard . . . is highly deferential . . . [and] requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir. 2000) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)); *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a differ-

ent conclusion as to the proper administration and application of the procurement regulations.")).

### B. *Injunctive Relief Standard*

Plaintiff seeks a permanent injunction that would cancel the award to DJM and award it the contract. Pl.'s Cross–Motion for J. Upon the Admin. R. at 3 (hereinafter "Pl.'s Cross–Motion"). "A court may issue a permanent injunction . . . if plaintiff establishes that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to the plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) granting the injunction serves the public interest." *Great Lakes Dredge & Dock Co. v. United States,* 60 Fed.Cl. 350, 369 (2004) (citing *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir. 1993)); *Al Ghanim Combined Group v. United States,* 56 Fed.Cl. 502, 519–20 (2003); *Interstate Rock Prods., Inc. v. United States,* 50 Fed.Cl. 349, 350 (2001). Plaintiff bears the heavy burden of proving it is entitled to injunctive relief by "clear and convincing evidence." *CSE Constr. Co. v. United States,* 58 Fed.Cl. 230, 261 (2003) (citations omitted).

### IV. DISCUSSION

### A. *Standing*

▇ The court must first address the issue of prejudice before addressing the merits "because the question of prejudice goes directly to the question of standing." *Info. Tech.,* 316 F.3d at 1319. In order to establish standing, plaintiff must show that it was an interested party prejudiced by the award. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir. 2001), *cert. denied,* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 885 (2002)). To establish prejudice, a protester must demonstrate "that there was a 'substantial chance' it would have received the contract award but

for [the] error."[4] *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1331 (Fed. Cir.2004) (citing *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)).

Here, plaintiff asserts that if "the agency requested the amount of funding in line with the O'Halloran estimate, First Enterprise would have been awarded the contract." Pl.'s Cross–Motion at 13. Plaintiff further alleges that if the estimates were wrong "then a revised project-funding request should have been prepared, even if it changed the category to a 'major' project from a 'minor' project," thus making it possible for the agency to award the contract to plaintiff for its low bid. *Id.*

There is no argument that plaintiff was a qualified bidder that was "within the zone of active consideration," since it was the lowest bidder after Ace withdrew. *Statistica, Inc.,* 102 F.3d at 1581. Therefore, Plaintiff has established prejudice because, if successful on the merits, it would have a greater than insubstantial chance of securing the contract. *See Info. Tech.,* 316 F.3d at 1319.

### B. Were the Contracting Officer's Actions Arbitrary and Capricious?

Plaintiff asserts two principal arguments to support its RCFC 56.1 motion for judgment upon the administrative record. Plaintiff's first argument is premised on the alleged improprieties by the agency in planning and conducting the IFB. Specifically, plaintiff argues that the agency was arbitrary and capricious in basing its funding request on its own estimate, rather than the O'Halloran estimate; this error, in turn, tainted the entire Solicitation. Plaintiff makes three separate sub-arguments based on this alleged error. First, plaintiff claims that the agency's decision to ignore the O'Halloran estimate resulted in the issuing of a solicitation which it "did not have adequate funding to procure." Pl.'s

Cross–Motion at 7. Second, plaintiff claims that according to "standard contracting procedures" it should have been awarded the project since its bid was the next low offer after Ace withdrew and only slightly higher than the O'Halloran estimate. First Amended Compl. ¶ 60. Third, plaintiff claims that the agency's lack of funding was not a compelling reason to convert the IFB to an RFP. Pl.'s Cross–Motion at 13.

Plaintiff's second principal argument centers around the alleged errors made by the contracting officer after conversion of the IFB to an RFP. Plaintiff makes two separate arguments to support its claim. First, plaintiff claims the agency should have accepted plaintiff's offer of $3,680,895 for alternate bid item 5 since that amount was within the $4,000,000 statutory limit for the project and alternate bid item 5 is preferable to alternate bid item 6. *Id.* at 18. Second, plaintiff claims that the contracting officer "abrogated his responsibility" by failing to do a cost realism analysis because DJM's low bid for alternate bid item 6 indicates either a mistake by DJM or that DJM did not understand the Solicitation. *Id.* at 25.

### 1. The Invitation for Bids

a. Did the VA provide adequate funding for the project?

█ Plaintiff's primary contention is that the agency was arbitrary and capricious when it issued the Solicitation without proper funding to award a contract. Plaintiff's argument is two-fold: first, plaintiff asserts the agency was required to base its funding request on the O'Halloran estimate of $3,596,111, not the agency's own construction estimate of $3,218,781; and second, plaintiff asserts the agency issued the Solicitation without intent to award a contract because the agency should have known that using its own estimate would result in insufficient funding for the project.

---

**4.** Some courts have characterized the "substantial chance" standard as a "reasonable likelihood" of success but for the alleged error. *See Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) (In order to prove prejudice "a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester

would have been awarded the contract."). *See also CACI, Inc.—Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration.'") (citation omitted).

It is beyond any doubt that agency officials have broad discretion in managing agency funds. This court finds persuasive GAO's long held view that "[t]he management of an agency's funds generally depends on that agency's judgment concerning which projects and activities shall receive increased or reduced funding." *National Projects, Inc.,* 2000 CPD ¶ 16, 2000 WL 151138 (2000) (unpublished) (citing *Armed Forces Sports Officials, Inc.,* 93–1 CPD ¶ 261, 1993 WL 86746 (1993), *recons. denied,* 93–1 CPD ¶ 402, 1993 WL 188676 (1993)); *see also First Enterprise,* B–292967, 2004 WL 35556, Jan. 7, 2004; *Michelle F. Evans,* 95–1 CPD ¶ 139 at *2, 1995 WL 92621 (1995) (unpublished); *Kato/Intermountain Elec., A Joint Venture,* 92–1 CPD ¶ 129 at *2, 1992 WL 22945 (1992) (citation omitted); *NDT–1, Inc.Req. for Recons.,* 86–1 CPD ¶ 364, 1986 WL 63341 (1986); *Genco Tool & Eng'g Co.,* 82–1 CPD ¶ 175, 1982 WL 26591 (1982).[5]

Simply put, the process an agency uses to make internal management decisions is a matter best left to the agency. This is because courts as a general matter have neither the authority nor the expertise required to instruct an agency how to conduct its internal affairs. *See Prof'l Pilots Fed'n v. F.A.A.,* 118 F.3d 758, 764–65 (D.C.Cir.1997) (when reviewing an agency's decision not to initiate a rulemaking, courts afford the agency a more deferential standard of review than arbitrary and capricious when the agency's decision is based on "pragmatic considerations" such as "internal management considerations as to budget") (quoting *Bargmann v. Helms,* 715 F.2d 638, 640 (D.C.Cir.1983)). If courts subjected agency processes for determining the amount of funding a project requires to judicial scrutiny, courts would remove management authority from Congress' delegee, the agency head, and thus become the *de facto* managers of the agency. *See* 38 U.S.C. § 303 (the Secretary of Veterans Affairs "is responsible for ... the control, direction, and management of the Department"). Given this impermissible result, an agency has virtually a *carte blanche* right to decide the amount of funding it will spend on a given project. *See Sinha v. Veterans Administration,* 768 F.2d 330, 332 (Fed.Cir. 1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986) (stating that the decision of Veterans Affairs to stop furnishing funds to pay petitioner's salary "involved the essence of agency management discretion"). Cognizant of these precepts stemming from the doctrine of separation of powers, and mindful of the necessary restraint needed of courts when reviewing matters best left in the hands of the political branches, plaintiff must here erect a very powerful case indeed for the court to breach the thick walls of agency discretion in budgetary decisions. Plaintiff, unsurprisingly, fails to demonstrate that the VA was irrational in the manner it exercised its broad discretion.

Plaintiff argues that the agency's estimate of $3,218,781 for the construction portion of the project was inadequate, and that the agency was required to use the O'Halloran estimate when requesting funding for the project. The agency's failure to rely on the O'Halloran estimate, according to plaintiff, led to inadequate funding for the overall project. Specifically, plaintiff asserts that the agency knew or should have known that the cost of the construction would be greater than the amount allocated for the project since the O'Halloran estimate was greater than the construction estimate. Accordingly, plaintiff argues the agency should have either "taken out portions from the scope of work or ... [requested] more funding."[6] Tr. of Oral Arg. at 7:22–25, 8:1–6.

To determine adequate funding, plaintiff makes its own calculations based on the

---

5. The court is not bound by decisions of the Comptroller General. However, GAO decisions can be used for guidance when they are found to be reasonable and persuasive. *CACI Field Servs. v. United States,* 13 Cl.Ct. 718, 731 n. 28 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988).

6. · The agency did deduct portions of the project as part of the Solicitation. The agency specifically chose to include 5 alternate bid items in the IFB, which prevented excessively high offers on the main bid item from automatically precluding award of the contract by allowing offerors to further reduce their bid prices on the alternate bid items. Hence, the Agency's inclusion of the alternate bid items makes it more likely that an offeror's price would fall within the project budget.

O'Halloran estimate. Plaintiff argues that the agency should have added contingency and impact costs to the O'Halloran estimate to arrive at the proper amount of funding.[7] Since the O'Halloran estimate listed "0% contingency" costs, plaintiff adds to that estimate 7.5 percent in contingency costs and $50,000 in impact costs for a total estimate of $3,915,819. With the addition of design costs as originally estimated by the agency at $406,394, the total project cost, according to plaintiff, is $4,322,213 which exceeds the $4,000,000 maximum the agency could spend for Minor Construction Projects.[8] First Am. Compl. ¶ 21. Plaintiff claims, therefore, that the agency's request and receipt of $3,916,584 in allocated funds for the project was not adequate funding. The court disagrees.

Plaintiff's contentions wholly fail to prove that the agency did not provide adequate funding for the project. And perhaps even more important, while plaintiff maintains that the agency was required as a matter of law to rely on the O'Halloran estimate, it simply provides no support for this proposition. Tr. of Oral Arg. at 47: 10–16. Plaintiff, therefore, has neither provided a valid counter to the claim that the agency set aside satisfactory funding nor offered a justification for a court foray into the guarded realm of agency management decisions.

More specifically, the agency budgeted $3,551,000 for the construction portion of the project.[9] (Ironically, this figure is only 1 percent lower than the O'Halloran estimate

of $3,596,111 for the main bid item. This in itself sheds doubt on plaintiff's assertions.) Although plaintiff tacks on contingency and impact costs to the O'Halloran estimate, it does not cite to, nor does the court know of, any law requiring the agency to include these costs in the project budget.[10] For that matter, the agency's allocated funding for the project construction was sufficient to even satisfy the O'Halloran estimate for alternate bid items 3, 4 and 5.[11] The agency would surely have liked to have awarded the contract for the main bid item, but it acted reasonably in issuing the Solicitation with ample funding for three of the alternate bid items.

Simply put, the court finds that the Solicitation rationally furthers the agency's balancing of two competing administrative concerns: a desire to purchase an ideal construction project and a limited budget. Such considerations often form the basis of agency management decisions, and plaintiff has not proffered one cogent reason for the court to interfere with the agency's decision. In sum, plaintiff has not shown that the agency was required by law to base its funding request on the O'Halloran estimate. Nor has it demonstrated that the agency's estimate for the project was arbitrary and capricious or contrary to law.

Plaintiff also claims as a ground for review that the agency simply did not intend to make an award because, upon receiving the O'Halloran estimate, the agency should have

---

7. Contingency costs are calculated by adding some percentage of the construction estimate to the construction cost. This amount is set aside for cost overruns, delays or other contingencies, and are, according to plaintiff though denied by defendant, required. Pl.'s Cross–Motion at 7. Impact costs are funds used to relocate personnel or otherwise deal with the impact of the construction and are, again according to plaintiff only, required. Pl.'s Cross–Motion at 8.

8. See 38 U.S.C. § 8104(a)(2). At the time of this procurement, a project for construction of a medical facility involving a total expenditure of more than $4,000,000 was considered a "major medical facility project" and required specific authorization by law. Pub.L. No. 104–262, § 206(a), 110 Stat. 3177, 3190. On Dec. 6, 2003, Congress increased the dollar cap to $7,000,000. Pub.L. No. 108–170, § 201, 117 Stat.2042, 2047.

9. $3,551,000 is the approximate amount of funds remaining for construction after subtracting the actual design costs of $366,000 from the agency's original allocation of $3,916,584. Note that the actual design costs were less than the original estimate of design costs at $406,394. The excess from the design portion of the contract could be allocated to the construction portion of the project. Admin. R. at 164 (11:18:20 to 11:19:10).

10. At oral argument, the agency's counsel specifically stated that the agency is not required as a matter of law to provide funding for contingency and impact costs as part of their construction budget. Tr. of Oral Arg. at 35:1–4.

11. The O'Halloran estimate for alternate bid items 3, 4 and 5 was, respectively, $3,513,111, $3,494,111, and 3,471,111.

known that it did not request sufficient funds for completing the project. Pl.'s Cross–Motion at 9. In support of its claim, plaintiff quotes the 1992 version of the Federal Acquisition Regulation ("FAR") 15.402(c), which read "contracting officers shall solicit proposals or quotations only when there is a definite intention to award a contract." 48 C.F.R. § 15.402(c) (1992); Pl.'s Cross–Motion at 7. But the court, as explained, rejects plaintiff's *a priori* factual assumption buttressing this contention—that there was not sufficient funding for the project and hence the agency did not request sufficient funding.

Furthermore, the court does not see how the language of this FAR proves plaintiff's point. Plaintiff's counsel at oral argument admits that there is no evidence here of agency fraud or bad faith.[12] Absent fraud or bad faith, and within appropriate statutory and agency parameters, an agency may budget whatever it wants for a project. *See National Projects, Inc.*, 2000 CPD ¶ 16, 2000 WL 151138 (2000) (unpublished) (citing *Armed Forces Sports Officials, Inc.*, 93–1 CPD ¶ 261, 1993 WL 86746 (1993), *recons. denied*, 93–1 CPD ¶ 402, 1993 WL 188676 (1993)); *see also First Enterprise*, B–292967, 2004 WL 35556, Jan. 7, 2004; *Michelle F. Evans*, 95–1 CPD ¶ 139 at *2, 1995 WL 92621 (1995) (unpublished). To be sure—and this is the kicker here—this citation is beside the point for even a more fundamental reason— the 1997 FAR part 15 rewrite removed this very language from the FAR.[13] 48 C.F.R. § 15.402(c)(1998); 48 C.F.R. § 15.402(1997); Federal Acquisition Regulation; Part 15 Rewrite: Contracting by Negotiation; Competitive Range Determinations, 62 Fed.Reg. 26,-640 et seq. (May 14, 1997) (codified at 48 C.F.R. pt. 15).

Besides, even assuming *arguendo* the validity of plaintiff's argument that the government may not ever issue a solicitation without intent to award a contract,[14] this argument remains unconvincing as a simple factual matter. Apart from the fact that the agency ultimately awarded the contract to DJM, few things could better establish the agency's intent to award a contract than its initial award to Ace's bid under the original IFB. Admin. R. at 49, 137. Only Ace's unilateral withdrawal from the process prevented the agency from awarding a contract under the IFB. This surely demonstrates a definitive intent by the agency to make an award.

Plaintiff cites another FAR section, FAR 15.402(a)(3), for a similar proposition—this time that an agency may not issue a solicitation unless it has adequate funding. Plaintiff's Cross–Motion at 10 (quoting 48 C.F.R. § 15.402(a)(3)). Plaintiff's Cross–Motion at 10; Tr. of Oral Arg. at 11: 23–25, 12: 1–5. . But, this contention suffers from the same defect as alluded to just above and also discussed in the prior section—plaintiff simply offers no factual proof for its mere supposition of a lack of adequate funding. Sheer repetition of a thing will not make it a fact.

Furthermore, just like above, plaintiff misstates the import of the FAR section. The Solicitation in this case did not require offerors to submit cost or pricing data. Admin. R. at 127. FAR 15.402(a)(3), and related provisions, control the applicability of such data and are thus irrelevant to any inquiry in this case. Specifically, this section provides that contracting officers may not "require unnecessarily the submission of cost or pricing data, because it leads to increased proposal preparation costs, generally extends acquisition lead time, and consumes additional

---

12. Although it is true that the government cannot act in bad faith when making a solicitation, plaintiff's counsel stated at oral argument that plaintiff is "not arguing that the government acted in bad faith, in this case." Tr. of Oral Arg. at 5: 15–17.

13. 48 C.F.R. § 15.402(c) now reads "Not include in a contract price any amount for a specified contingency to the extent that the contract provides for a price adjustment based upon the occurrence of that contingency."

14. Currently, the FAR requires contracting officers to include provisions in both IFBs and RFPs which express the government's intention to award a contract, but those provisions also reserve the government's right to "reject any or all" bids or proposals. 48 C.F.R. §§ 14.201–6(m), 15.209(a), 52.214–19, 52.215–1(f)(2). Furthermore, the FAR allows the government to issue solicitations known as requests for information without intending to award a contract. 48 C.F.R. §§ 15.201(a), 52.215–3(a).

contractor and Government resources." 48 C.F.R. § 15.402(a)(3). Prior to awarding a contract, contracting officers must ensure that the price to the government is fair.[15] 48 C.F.R. §§ 14.408–2, 15.402(a).

When, such as in this case, neither a statute nor any applicable FAR requires the submission of cost or pricing data by offerors, the contracting officer must determine whether prices are fair by using the following order of preference: (1) no additional information (2) information other than cost or pricing data (3) cost or pricing data. 48 C.F.R. § 15.402(a). In other words, "the contracting officer should use every means available to ascertain whether a fair and reasonable price can be determined *before* requesting cost or pricing data." 48 C.F.R. § 15.402(a)(3) (emphasis supplied). FAR 15.402(a)(3) explains the rationale behind this policy—a request for cost or pricing data "leads to increased proposal preparation costs, generally extends acquisition lead time, and consumes additional contractor and government resources." 48 C.F.R. § 15.402(a)(3).

Consequently, a careful read of FAR 15.402(a) makes it clear that the provision has nothing to do with issuing solicitations or the preparation of the government estimates, as plaintiff suggests. Instead, section 15.402(a) describes the price reasonableness inquiry. *See e.g. All Phase Environmental, Inc.,* B–292919.7, 2004 WL 437450, Feb. 4, 2004, 2004 CPD ¶ 62 at *7 (unpublished); *Rochester Optical Mfg. Co.,* B–292247.2, Aug. 6, 2003, 2003 CPD ¶ 138 at *3, 2003 WL 21884877; *Nutech Laundry & Textiles, Inc.,* B–291739, Feb. 10, 2003, 2003 CPD ¶ 34 at *3, 2003 WL 282208; *CSE Constr.,* B–291268.2 Dec. 16, 2002, 2002 CPD ¶ 207 at *4, 2002 WL 31835783. In sum, this provision is inapplicable to the case at bar.

b. Award

■ Plaintiff claims as a further ground to overturn the agency's award that the con-

tracting officer should have selected its bid for alternate bid item 5 after Ace withdrew because plaintiff made the lowest offer of the remaining three bidders. Nevertheless, the court must point out, that while the agency did examine the remaining offerors' bids after Ace withdrew, there can be no serious disagreement that *all* the remaining bids were over the maximum amount the agency could spend on the construction portion of the contract. This comports with two agency restrictions limiting the amount it could spend. First, the agency only had approximately $3,551,000 it could allocate for the construction—$3,916,584 less $366,000 already spent on the design. Second, the agency could not conduct any procurement involving a total project cost of more than $4,000,000, except pursuant to project-specific authorizing legislation. 38 U.S.C. § 8104(a)(2); Admin.R. at 164 (11:17:30 to 11:17:50 and 11:30:25 to 11:30:32).

Plaintiff's argument thus ignores the salient fact that the agency was working within a budget. Under the Anti–Deficiency Act, 31 U.S.C. § 1341(a)(1)(A)[16], the agency simply was not permitted to award a contract at a price in excess of the "amount available in an appropriation or fund for the expenditure or obligation." Although plaintiff's bid was the lowest of the remaining bids, its offer of $3,680,895 for alternate bid item 5 exceeded the available funds for construction, and when coupled with the design costs already incurred, exceeded the $4,000,000 maximum for minor construction projects. Hence, the contracting officer properly concluded that all the remaining bids were "unreasonable" and converted the IFB to an RFP. Admin. R. at 79.

c. Cancellation of the IFB

Plaintiff argues that cancellation of the Solicitation was inappropriate, particularly since the bids of the offerors had been dis-

---

**15.** This process is known as "price reasonableness analysis."

**16.** The relevant portion of the Anti–Deficiency Act provides: "An officer or employee of the United States Government or of the District of

Columbia government may not make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A).

closed.[17]  Not surprisingly, plaintiff once again argues that the proper step should have been for the VA to direct the award to plaintiff after Ace withdrew its offer.  Pl.'s Cross–Motion at 15.  This is a corollary to plaintiff's mantra that if only the agency had requested proper funding in accordance with the O'Halloran estimate, its bid (in this case alternate bid item 5) would have been considered reasonable.  *Id.* at 13.  Plaintiff now adds new grist to this mill: "even if there was a lack of funding, the agency could have issued a negative change order to come within the available funding" or perform "value engineering" to come within the available funding.  First Amended Complaint at ¶ 54.

Defendant counters by arguing that there were two compelling reasons why the IFB should have been cancelled.  First, all the remaining bids were in excess of the maximum amount available for construction, $3,551,000.  Def.'s Mot. for J. Upon Admin. R. at 7.  Second, all of the remaining bids when added to the $366,000 for design costs exceeded the $4,000,000 cap.  *Id.*

The court agrees.  The law is that although cancellation of a solicitation is disfavored after bids have been opened, cancellation of an IFB is permitted in compelling circumstances.  FAR 14.404–1(a)(1) provides that "[p]reservation of the integrity of the competitive bid system dictates that, after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation."  48 C.F.R. § 14.404–1(a)(1) (2004).  A compelling reason includes instances where "the agency head determines in writing that [a]ll otherwise acceptable bids received are at unreasonable prices."  48 C.F.R. § 14.404–1(c)(6) (2004).

■ "The authority vested in the contracting officer to decide whether to cancel an IFB and readvertise is extremely broad.  A determination concerning the unreasonableness of the prices bid is a matter of administrative discretion which should not be questioned unless the determination is shown to be unreasonable or that there is a showing of

fraud or bad faith."  *Overstreet Elec. Co., Inc. v. United States,* 47 Fed.Cl. 728, 732 (2000) (quoting *Caddell Constr. Co. v. United States,* 7 Cl.Ct. 236, 241 (1985));  *Accord Howard W. Pence, Inc.,* 97–2 CPD ¶ 150, 1997 WL 724544 (1997) (citations omitted) ("The determination that prices are unreasonable is a matter of administrative discretion, which [GAO] will not disturb unless the determination is unsupported or there is a showing of fraud or bad faith on the part of contracting officials.").

■ Furthermore, the court notes that if the agency head cancels the invitation for bids because all bids contain unreasonable prices, the agency head may authorize completion of the acquisition through negotiation.  48 C.F.R. § 14.404–1(e)(1) (2004).  When the agency head authorizes negotiations, thus canceling the original invitation for bids, the contracting officer may negotiate and make award without issuing a new solicitation provided that (1) the contracting officer gives notice and an opportunity to participate in negotiations to each responsible bidder in the sealed bid acquisition; and (2) the contracting officer makes award to the responsible bidder offering the lowest price.  48 C.F.R. § 14.404–1(f) (2004);  *See also Overstreet Elec. Co., Inc.,* 47 Fed.Cl. at 734 ("if an IFB is properly cancelled due to unreasonable bid prices ... the agency may complete the acquisition through negotiation").

There are various factors an agency may consider in determining price unreasonableness.  One means that may be used in determining whether a bid reflects an unreasonable price is nonavailability of funds since an agency cannot award contracts that exceed available funding.  *See* Anti–Deficiency Act, 31 U.S.C. § 1341(a)(1)(A) ("An officer or employee of the United States Government or of the District of Columbia government may not make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation.");  *See also* 48 C.F.R. § 32.702 (2004) (an officer of the government may not create an obligation in excess of the funds

---

**17.**  The Solicitation stated "offers will be publicly opened."  Admin. R. at 36.  Therefore, each offeror knew prior to submitting its bid that the bid prices would be publicly disclosed.

available); *First Enterprise,* B–292967, Jan. 7, 2004, 2004 CPD ¶ 11, 2004 WL 35556. "The agency's right to cancel a solicitation when sufficient funds are not available is not affected by disputes concerning the validity of the government estimate or the reasonableness of the low responsive bid price." *Armed Forces Sports Officials, Inc.,* 93–1 CPD ¶ 261, 1993 WL 86746 (1993) (citations omitted); *Accord Nat'l Projects, Inc.,* 2000 CPD ¶ 16, 2000 WL 151138 (2000). Another acceptable means of determining whether a bid is unreasonable is by comparing the bid to the Government estimate. *Overstreet Elec. Co., Inc.,* 47 Fed.Cl. at 732 (quoting *Kinetic Structures Corp. v. United States,* 6 Cl.Ct. 387, 395 (1984)).

Comparing the agency's estimate for alternate bid item 5 with plaintiff's bid suggests that the agency's decision to cancel the IFB was reasonable. "A good indicator that the prices offered are unreasonable is a material variance from the Government's estimate of what the procurement should cost." 1B John Cosgrove McBride & Thomas J. Touhey, *Government Contracts* (hereinafter "McBride & Touhey") § 10.20[5]. While the O'Halloran estimate for alternate bid item 5 was $3,471,111, the remaining bids after Ace withdrew were all higher: First Enterprise $3,680,895; DJM $3,900,000; Stronghold Engineering, Inc. $3,885,127. Admin. R. at 44–45; *See Bldg. Maint. Specialists, Inc.,* 76–2 CPD ¶ 233, 1976 WL 9755 (1976) (GAO has upheld a finding that all bids are unreasonable where the lowest bid was 7.2 percent above the government estimate).[18]

Plaintiff asserts that it would have been awarded the contract if the agency had not failed to "assess the veracity and accuracy of its initial estimates." Pl.'s Cross–Motion at 9. However, this unsupported argument, without more, is not sufficient to prove the agency did not provide adequate funding for the construction portion of the project. As mentioned above, plaintiff has failed to show that the agency estimate for the project was arbitrary or capricious, or insufficient to satisfy the requirements of the project. *See*

*Overstreet Elec. Co., Inc.,* 47 Fed.Cl. at 733 (citing McBride & Touhey, § 10.20[4] ("Generally the fact that all responsive bids exceed the Government's estimate is not itself sufficient to establish the reasonableness of the bidders' prices and the unreasonableness of the Government's estimate.")). Accordingly, the. court finds both rational and lawful the agency's two compelling reasons proffered here for canceling the IFB and converting it to an RFP: lack of funding and bid prices in excess of the government estimate. Admin. R. at 79.

Plaintiff's reliance on *Overstreet Elec. Co.,Inc.* to support its contention that the agency acted arbitrarily and capriciously when converting the IFB to an RFP is also wholly misplaced. Pl.'s Cross–Motion at 15. In *Overstreet Elec. Co., Inc. v. United States,* 47 Fed.Cl. 728 (2000), this court held that the Army Corps of Engineers "acted in an arbitrary and capricious fashion in constructing the estimate that it used for assessing the reasonableness of the price in plaintiff's bid." *Id.* at 744. "In order for [an] estimate to be rational, it is not necessary that it be performed with impeccable rigor, but it must not be tainted by irrational assumptions or critical miscalculations," *Id.* at 733 (quoting *OMV Medical v. United States,* 219 F.3d 1337,-1343–44 (Fed.Cir.2000)) (internal quotations omitted). In *Overstreet,* the Corps deemed all prices unreasonable solely because the low bid exceeded the Corps' original estimate for the project by 59.1 percent and its revised estimate by 32.1 percent. *Id.* at 730. The Corps' estimate, however, did not include adequate costs for home office overhead and quality control personnel. *Id.* at 734–40. The job described in the solicitation necessarily required these costs, and, accordingly, each offeror included the costs in its bid. *Id.* The Corps then used its estimate, which ignored the costs, to conclude that each bid price was unreasonable. *Id.* at 730. Therefore, the Corps did not show a compelling reason for converting the IFB to an RFP because the Corps' own estimate, the only justification for the conversion, failed to

---

18. Furthermore, plaintiff's bid of $3,680,895 exceeded the O'Halloran estimate of $3,471,111 by

approximately 6 percent. Admin. R. at 44.

accurately depict a reasonable price. *Id.* at 734–45.

Clearly, the facts of *Overstreet* differ from the case at bar. The VA cited two compelling reasons for canceling the IFB: first, inadequate funding and, second, prices in excess of the government estimate. Unlike this case, the Corps in *Overstreet* did not offer inadequate funding as a reason for cancellation. Hence, the VA offers an additional compelling reason not addressed in *Overstreet.*

More importantly, the O'Halloran estimate, unlike the Corps' estimate in *Overstreet,* was not "tainted by irrational assumptions or critical miscalculations." *See Overstreet Elec. Co., Inc.,* 47 Fed.Cl. at 733. Although First Enterprise complains that the VA's own construction estimate of $3,218,781 was arbitrary, the VA did not use that estimate to evaluate the bids—it used the O'Halloran estimate of $3,596,111. Admin. R. at 44. Unlike the Corps' estimate in *Overstreet* which did not include accurate cost estimates for all elements of the work required by the solicitation, the O'Halloran estimate accurately reflects all construction costs.[19] *Compare Overstreet Elec. Co., Inc.,* 47 Fed.Cl. at 734–40 *with* Admin. R. at 4–26. First Enterprise's only complaint regarding the O'Halloran estimate is that it did not include contingency and impact costs, but First Enterprise fails to show that the offerors used these costs in their bids, and does not cite any authority requiring the agency to include these costs in the Solicitation. Pl.'s Cross–Motion at 7–8. As such, the VA properly used the O'Halloran estimate to evaluate the bids and, when all bids exceeded that estimate, justifiably cancelled the IFB.

The court also rejects plaintiff's assertion that the agency could have awarded it the contract by issuing a "negative change order" or performing "value engineering" to come within the available funding. Pl.'s Cross–Motion at 15. Plaintiff misunderstands these concepts.

"Value engineering is the formal technique by which contractors may (1) voluntarily suggest methods for performing more economically and share in any resulting savings or (2) be required to establish a program to identify and submit to the Government methods for performing more economically. Value engineering [thus] attempts to eliminate, without impairing any of the essential functions or characteristics, anything that increases acquisition, operation, or support costs." 48 C.F.R. § 48.101(a). Construction contracts must include a provision that encourages contractors to submit value engineering proposals. 48 C.F.R. §§ 48.202, 52.248–3. Consequently, plaintiff incorrectly argues that the agency should have conducted value engineering when, according to the FAR, it is the contractor who performs value engineering, not an agency.

Plaintiff further misconstrues what a "change" order is. When a contract contains a change clause, the contracting officer may issue change orders "to make unilateral changes ... within the scope of the contract." 48 C.F.R. § 43.201(a). Plaintiff claims that a contracting officer can also issue a "negative" change order which "decreases the scope of work or the cost of the total project." Tr. of Oral Arg. at 15: 23–25. But plaintiff's argument fails to consider that the "change order" regulation contemplates that a contracting officer may only issue a change order *after* awarding a contract.

In any event, the agency here could not have awarded plaintiff the contract and then issued a change order for two reasons. First, as stated, the Anti–Deficiency Act prohibits an agency from exceeding allocated funding for a project. 31 U.S.C. § 1341(a)(1)(A). Awarding a contract to plaintiff for $3,680,895, for its bid on alternate bid item 5, would have exceeded the $3,551,000 remaining in the agency's budget and thus constituted "an expenditure or obli-

---

**19.** First Enterprise implicitly acknowledges the accuracy of the O'Halloran estimate because it argues that the VA should have used that estimate when requesting funding for the project. *See* Pl.'s Cross–Motion at 8; Tr. of Oral Arg. at

47: 13–19 ("in this case, they had to rely on that O'Halloran estimate ... when they requisition their funds, they have to rely on their reasonable estimate").

gation exceeding an amount available in an appropriation or fund for the expenditure or obligation." *Id.* Second, and relatedly, if the agency sought to construct a medical facility project that exceeded $4,000,000 it would need to have sought additional congressional approval. See 38 U.S.C. § 8104(a)(2). Plaintiff's bid for alternate bid item 5 coupled with the design cost of $366,00 would total $4,046,895. Therefore, the agency could not lawfully award the contract to plaintiff for its bid on alternate item 5 without seeking additional congressional approval.

Accordingly, even assuming *arguendo* that somehow a "negative" change order or value engineering should have been done, this does not negate the hard fact that the agency provided a compelling reason to cancel the Solicitation: the law required it to do so—the proffered bids simply exceeded the funds budgeted for the project. As such, the mere existence of hypothetical alternative options does not void the legality of the agency's decision to convert the IFB to an RFP.

### 2. Request for Proposals

#### a. Alternate Bid Item 5

After canceling the IFB and converting it to an RFP, the three remaining offerors resubmitted new bids for each bid item, including the newly added alternate bid item 6. Plaintiff takes issue with the contracting officer's award to DJM for alternate bid item 6, arguing that the agency should have awarded it the contract for its bid on alternate bid item 5 instead because its bid was within the agency's funding for the project.

According to plaintiff, the upper limit on the project funding was $4,000,000, not $3,916,584, because the agency could have made a request, called a Cost Limit Increase ("CLI"), for additional funding up to the $4,000,000 statutory limit. Pl.'s Reply to Def.'s Resp. to Pl.'s Cross–Motion at 9 (hereinafter "Pl.'s Reply"). Therefore, plaintiff argues, after allocating $366,000 for design services, the agency had $3,634,000 available for completion of the project, and plaintiff's

bid on alternate bid item 5, at $3,613,786 was within this limit. First Am. Compl. ¶ 68–69.

Furthermore, plaintiff argues the "best value" for the agency would have been to award the contract pursuant to the requirements for alternate bid item 5 since, unlike alternate bid item 6, it included air conditioning, which is "necessary for any building in California, where the climate is hot." [20] Pl.'s Cross–Motion at 19. Accordingly, plaintiff concludes that the agency's decision to award the contract to DJM for its bid on alternate bid item 6 rather than to plaintiff for its bid on alternate bid item 5 is arbitrary and capricious. Pl.'s Reply at 9. Defendant-counters this argument by reminding the court that the project funding was limited not only by the statutory $4,000,000 cap, but also by the actual project allocation of $3,916,584. Def.'s Mot. For J. upon the Admin. R. at 12; Def.'s Resp. to Pl.'s Cross–Motion at 6.

■ Once again this court is faced with the issue of the proper scope of judicial interference in agency decision-making. That scope by necessity must be limited. Courts do not sit to second-guess what bid will give the better value, the more "bang for the buck." Courts under the Tucker Act must only see to it that agencies act rationally. Consequently, the court must accord broad deference to a contracting officer's decision as to which proposal in a negotiated procurement represents the best value. *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed. Cir.1996) (citing *Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir. 1993)). *See also Ellsworth Associates, Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions."); *R.R. Donnelley & Sons, Co. v. United States,* 38 Fed.Cl. 518, 522–23 (1997) ("In a negotiated procurement, procurement officials possess a high degree of discretion in their efforts to obtain a contract most beneficial to the Government."). Thus, the court's role is simply to ascertain "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa Construz-*

---

**20.** The agency intends to add the air conditioning through another contractor. First Am. Compl. ¶ 71.

*ioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332–33 (Fed.Cir.2001) (quoting *Latecoere Int'l, Inc. v. United States,* 19 F.3d 1342, 1356 (11th Cir.1994)). The disappointed bidder bears the burden of showing that there was no rational basis for the decision of the procurement official. *Id.*

█ Applying these standards, this court finds that the contracting officer clearly had a rational basis for selecting DJM's bid for alternate bid item 6. Before issuing the Solicitation, the agency chose to put a $3,916,584 limit on the project, and only $3,551,000 remained after the agency awarded the design portion. Based on the fact that plaintiff's bid of approximately $3,614,000 exceeded the available funds by $63,000, the contracting officer properly determined not to select plaintiff's offer for alternate bid item 5.

The court thus finds that the contracting officer acted rationally in awarding the contract to DJM because its bid on alternate bid item 6 was lower than the O'Halloran estimate for item 6, whereas awarding the contract to plaintiff for its bid on alternate bid item 5 would have exceeded the allocated funding. The contracting officer's decision hence was not arbitrary and capricious. It was rationally based on the bid prices and funding limitation. Although the contracting officer may have been able to accommodate plaintiff by seeking more funding, it was in the agency's discretion not to have done so, and, therefore, failure to seek more funding by itself cannot amount to arbitrary behavior.[21]

b. Cost Realism Analysis

█ Firing its last salvo, plaintiff's final contention is that the agency was required to do a "cost realism analysis"[22] since DJM's price for alternate bid item 6 was inconsis-

tent with DJM's own pricing pattern and materially lower than the government estimate. First Amended Complaint ¶ 66. The issue is therefore whether the agency's decision not to perform a cost realism analysis here was arbitrary and capricious. But even plaintiff's last salvo misfires.

Throughout its brief, plaintiff mistakenly uses the concept of "price reasonableness" interchangeably with "cost realism." Price reasonableness generally addresses whether a price is too high, whereas cost realism generally addresses whether a cost estimate is too low. *See Am–Pro Protective Agency, Inc.; MVM, Inc.,* 96–2 CPD ¶ 192 at *5, 1996 WL 784528 (1996). While there is a requirement for the contracting officer to do a price reasonableness analysis, there is no similar requirement to do a cost realism analysis. The contracting officer is responsible for evaluating the reasonableness of proposed prices to ensure that the price to the government is fair and reasonable. 48 C.F.R. § 15.404–1(a)(1) (2004); 48 C.F.R. § 14.408–2 (2004). "Normally, competition establishes price reasonableness." 48 C.F.R. § 15.305(a)(1) (2004). "[W]hen contracting on a firm-fixed-price ... basis, comparison of the proposed prices will usually satisfy the requirement to perform a price analysis, and a cost analysis need not be performed." *Id.* A cost analysis, on the other hand, may be appropriate to establish price reasonableness in situations where the government deems the price of an otherwise successful offeror unreasonable. *Id.;* 48 C.F.R. § 15.403–1(c)(1)(i)(B) (2004).

Here, the RFP only required offerors to submit their prices. Admin. R. at 127. After receiving bids from the three remaining offerors, the contracting officer performed a price analysis and deemed DJM's bid "re-

---

21. At oral argument defendant's counsel stated that the agency theoretically could have tried to increase the available funding. But, he also stated that "it [was] not clear that additional funding would be forthcoming, given the type of budgetary constraints that the agency has got." Tr. of Oral Arg. at 29: 21–25, 30:1–2. The law does not deal with hypothetical possibilities. "What ifs," and "could haves" are not at all relevant to contract law determination.

22. 48 C.F.R. § 15.404–1(d)(1) (2004) defines cost realism:
    Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

sponsive, responsible and eligible for contract award." *Id.* This price analysis coupled with the competition for the project establishes price reasonableness.

Plaintiff's main argument, however, is that the agency was arbitrary and capricious in not performing a cost realism analysis. According to the FAR, a cost realism analysis is *not* required in fixed price contracts, but the contracting officer *may* choose to do a cost realism analysis in fixed price-type contracts "when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors' proposed costs have resulted in quality or service shortfalls." [23] 48 C.F.R. § 15.404–1(d)(3). If the contracting officer chooses to do a cost-realism analysis in a fixed price contract, the contracting officer can only use the results in performance risk assessments and responsibility determinations. *Id.* The contracting officer will normally not perform realism analysis on an offeror's *price*—that is, determine whether an offeror's price is too *low*—because the contractor bears the risk of unreasonable estimates in fixed price contracts. *Labat–Anderson, Inc. v. United States,* 50 Fed.Cl. 99, 106 (Fed.Cl.2001) (citations omitted); *See also MVM, Inc. v. United States,* 46 Fed.Cl. 126, 133 (Fed.Cl.2000) (stating that, in fixed price contracts, competition between the offerors should ensure that the government gets a fair price).

In the instant case, the Solicitation contemplated award of a firm fixed price con-

tract and the contracting officer deemed DJM responsible to perform the project at the offered price.[24] Admin. R. at 34, 127. While the contracting officer is not precluded from doing a cost realism analysis here, there is no requirement to perform such an analysis. Since the Solicitation did not indicate that the agency would conduct a cost realism analysis, the contracting officer had discretion to determine whether there was a need for such an analysis.

Plaintiff claims, however, that the contracting officer should have performed a cost realism analysis because DJM's diversion from its own pricing pattern evidenced that DJM did not understand the Solicitation requirements and constituted an excessive risk. Pl.'s Cross–Motion at 21, 23. In addition, plaintiff claims that DJM's offer for alternate bid item 6 "was materially lower than the government estimate and therefore technically unacceptable, evidencing an indication of an inability to perform the work." *Id.* at 22. Based on this reasoning, plaintiff asserts, the contracting officer was required to do a cost realism analysis.

However, plaintiff's contentions could equally apply to its own bid. The court takes note that the difference between DJM's bid and plaintiff's bid for alternate bid item 6 is only 4 percent.[25] Therefore, plaintiff's assertion that DJM's offer was due to a mistake or failure to understand the terms of the Solicitation would equally apply to it. In other words, the similarity between plaintiff's and DJM's bids is indicative of the fact that both

23. A contracting officer must conduct a cost realism analysis in cost reimbursement contracts. 48 C.F.R. § 15.404–1(d)(2) (2004). In a cost reimbursement contract, offeror's submit proposals that only give an estimate of the total cost to the government and the government agrees to pay allowable costs incurred by the contractor. 48 C.F.R. § 16.301–1 (2004). Accordingly, the contracting officer conducts a cost realism analysis to determine the accuracy of each offeror's cost estimate. In contrast, firm-fixed-price contracts set a price to the government that is not subject to adjustment based on costs incurred by the contractor; that is, the government is aware of the total contract price at the time of acceptance. 48 C.F.R. § 16.202–1 (2004).

24. Before awarding a contract, the contracting officer must make an affirmative determination

that the winning offeror is responsible, 48 C.F.R. § 9.103(a) (2004), and "[t]he contracting officer's signing of a contract constitutes a determination that the contractor is responsible with respect to that contract." 48 C.F.R. § 9.105–2(a)(1) (2004); *see also Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1334 (Fed.Cir.2001) (the contracting officer does not have to explain the basis of a responsibility determination). To be responsible, a prospective contractor must meet several requirements, including: having adequate financial resources, the ability to comply with the delivery schedule and the necessary organization, experience and technical skills. 48 C.F.R. § 9.104–1 (2004).

25. DJM's offer of $2,989,000 was $121,000, or 4 percent, lower than plaintiff's offer of $3,110,316. Admin. R. at 132.

of their offers contained reasonable prices. Furthermore, it is rational for the contracting officer not to do a cost realism analysis here, since the offeror not the government, bears the risk of unreasonable estimates in fixed price contracts. *See Labat–Anderson, Inc. v. United States*, 50 Fed.Cl. 99, 106 (Fed.Cl.2001) (citations omitted). And, the contracting officer's determination that DJM was responsible is tantamount to finding DJM capable of completing the contract. Admin. R. at 127; *see* 48 C.F.R. § 9.104–1; *Duncan Sec. Consultants, Inc.*, 2002 CPD ¶ 144, 2002 WL 1820764 (2002) (citation omitted) (the agency was not required to do a cost-realism analysis in a fixed price contract to determine whether the offeror understood the contract requirements because the agency deemed the offeror responsible and, thus, able to perform at the low price).

In a similar vein, First Enterprise argues that DJM's low price evinces an attempt to buy-in or bid below cost. Pl.'s Cross–Motion at 23. Buying-in occurs when an offeror submits an offer below cost in an attempt to increase the contract amount after award or receive later contracts at artificially high prices to recover losses incurred from buying-in. 48 C.F.R. § 3.501–1 (2004). The contracting officer must ensure that the contractor does not recover buying-in losses. 48 C.F.R. § 3.501–2(a) (2004). *See also Cutler–Hammer, Inc. v. United States*, 189 Ct.Cl. 76, 416 F.2d 1306, 1312 (1969) ("If a contractor could knowingly understate certain costs in order to lower his price and obtain the contract, and thereafter show the true costs of the items and get an upward adjustment, this would work an injustice against the Government and the other bidders"). "The Government should minimize the opportunity for buying-in by seeking a price commitment covering as much of the entire program concerned as is practical." 48 C.F.R. § 3.501–2(b) (2004).

Because this protest involves a fixed-price contract—not, for example, a cost reimburse-

ment or indefinite delivery/indefinite quantity contract [26]—DJM would be unable to alter the contract price after award and, therefore, unable to recoup losses from the government. *Cf. Am–Pro Protective Agency, Inc.; MVM, Inc.*, 96–2 CPD ¶ 192 at *5, 1996 WL 784528 (1996) (an attempt to "buy-in" does not, by itself, render an offeror ineligible for an award) (citations omitted); *Shel–Ken Properties, Inc.; McSwain & Assocs., Inc.*, 95–2 CPD ¶ 139, 1995 WL 553321 (1995) (simply submitting a below-cost offer in a fixed price contract is legally unobjectionable, and an offeror's ability to perform at its proposed price is a matter of responsibility). Also, the contract covers virtually the entire construction project, so DJM will not have the opportunity to receive a future, high-priced contract. Accordingly, plaintiff neither offers evidence that DJM attempted to buy-in nor even that this contract presented a potential for buying-in.

For the aforementioned reasons, the contracting officer, in finding DJM responsible, deemed DJM capable of completing the project. Furthermore, the record is void of any suggestion that the contracting officer's decision resulted in an unreasonably high price to the government. Therefore, the court concludes that the contracting officer did not need to perform a cost realism analysis and properly made a price reasonableness assessment.

**C. *Request for Injunctive Relief***

Plaintiff asks the court to issue a permanent injunction forcing the agency to rescind the contract with DJM and make an award to plaintiff. Pl.'s Cross–Motion at 3. Plaintiff, however, fails to meet the standard for a permanent injunction because it has not achieved actual success on the merits. *See Great Lakes Dredge & Dock v. United States*, 60 Fed.Cl. 350, 369 (2004) (citations omitted); *See also ABF Freight Sys., Inc. v. United States*, 55 Fed.Cl. 392, 409 (2003)

---

26. Plaintiff relies on *Al Ghanim Combined Group Co. Gen. Trad. & Cont.*, 56 Fed.Cl. 502 (2003), but that case involved unbalanced contract line item pricing in an indefinite delivery/indefinite quantity ("ID/IQ") contract. Given an ID/IQ contract's uncertainty as to the quantity of items the government will need and when it will need them, an ID/IQ contract is exactly the sort of contract in which a contractor could subsequently attempt to recoup losses incurred from buying-in.

126

(citing *CESC Plaza Ltd. P'ship v. United States,* 52 Fed.Cl. 91, 101 (2002) ("Injunctive relief is inappropriate here because plaintiffs did not prove the merits of their claim")). Therefore, the court denies plaintiff's request for a permanent injunction.

## V. CONCLUSION

For the foregoing reasons, the court **GRANTS** defendant's motion for summary judgment on the administrative record and correspondingly **DENIES** plaintiff's cross-motion. Because the defendant's motion is **GRANTED,** plaintiff's petition for an injunction is **DENIED.** The Clerk of the Court is directed to enter judgment in favor of the United States. No costs.

**IT IS SO ORDERED.**