**SURVIVAL SYSTEMS, USA, INC., Plaintiff,**

v.

**The UNITED STATES of America, Defendant,**

and

**Proactive Technologies, LLC, Defendant–Intervenor.**

**No. 11–534 C.**

United States Court of Federal Claims.

Filed Under Seal: Nov. 4, 2011.

Filed with Redaction: Nov. 28, 2011.[1]

---

1. This Opinion was filed under seal on November 4, 2011, Docket Number (Dkt. No.) 48. The court directed that, if any party believed that the November 4 Opinion contained protected material that should be redacted before publication, that party shall, by motion filed on or before November 18, 2011 at 12:00 noon Eastern Standard Time, request that such protected material be redacted. In response to the court's directive

of November 4, 2011, the parties filed a consent motion to redact. Consent Mot. of the Parties to Redact Op. (Motion), Dkt. No. 50, filed November 18, 2011. The court ordered a clarification of the parties' Motion on November 21, 2011, Order of Nov. 21, 2011, Dkt. No. 51, to which the parties responded on November 21, 2011, Clarification, Dkt. No. 52, filed Nov. 21, 2011. The Motion is GRANTED.

Paul M. Vincent, Washington, DC, for plaintiff.

Kenneth D. Woodrow, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Martin F. Hockey, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Lisa Daniel–Wentz, Counsel for the Marine Corps, Orlando, FL, of counsel.

Holly Emrick Svetz, Tysons Corner, VA, for defendant-intervenor. James K. Kearney and Steven W. Cave, of counsel.

## OPINION

HEWITT, Chief Judge.

Before the court are plaintiff's Complaint for Declaratory and Injunctive Relief Federal Procurement (plaintiff's Complaint or Compl.), Docket Number (Dkt. No.) 1, filed August 24, 2011; Plaintiff Survival Systems, USA, Inc.'s Motion for Judgment on the Administrative Record (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 29, filed September 19, 2011; Plaintiff's Memorandum in Support of Its Motion for Judgment on the Administrative Record (Pl.'s Mem.), Dkt. No. 30, filed September 19, 2011; Defendant's Cross–Motion for Judgment upon the Administrative Record and Opposition to Plaintiff's Motion for Judgment upon the Administrative Record (defendant's Cross–Motion or Def.'s Mot.), Dkt. No. 33, filed September 30, 2011; Defendant–Intervenor ProActive Technologies, LLC's Cross Motion for Judgment on the Administrative Record, Dkt. No. 35, filed September 30, 2011 (defendant-intervenor's Cross–Motion); Defendant–Intervenor ProActive Technologies, LLC's Memorandum in Support of Its Cross Motion for Judgment on the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record (Int.'s Mem.), Dkt. No. 36, filed September 30, 2011; Plaintiff's Reply Memorandum In Support of Its Motion for Judgment upon the Administrative Record and Response to Defendant's and Defendant–Intervenor's Cross–Motions for Judgment upon the Administrative Record (plaintiff's Reply or Pl.'s Reply), Dkt. No. 43, filed October 7, 2011;[2] defendant's Reply Brief in Support of Defendant's Cross–Motion for Judgment Upon the Administrative Record (Def.'s Reply), Dkt. No. 44, filed October 13, 2011; and Defendant–Intervenor ProActive Technologies, LLC's Reply Memorandum in Support of Its Cross Motion for Judgment on the Administrative Record and In Response to Plaintiff's Reply (Int.'s Reply), Dkt. No. 46, filed October 13, 2011.

Defendant filed the Administrative Record (AR) on September 6, 2011, pursuant to the court's Orders of August 25, 2011, Dkt. No. 14 at 2, and September 6, 2011, Dkt. No. 20. Defendant subsequently filed an additional part of the AR (Add. AR) on September 7, 2011,[3] which was permitted by the court's Order of September 9, 2011, Dkt. No. 28. The parties completed briefing on October 13, 2011 and the court held oral argument on the motions at the National Courts Building on Friday, October 21, 2011 at 10:00 a.m. Eastern Daylight Time.[4] *See* Order of September 9, 2011, Dkt. No. 28 at 2.

## I. Background

This is a bid protest brought by Survival Systems, USA, Inc. (SSI or plaintiff), a small business that protests the award by the United States Marine Corps (USMC, defendant

---

2. It appears to the court that plaintiff filed duplicate Replies. *Compare* Docket Number (Dkt. No.) 42, *with* Dkt. No. 43. The court will rely on the last document filed and will treat Docket Number 43 as Plaintiff's Reply.

3. The court's prior opinion, *Survival Sys., USA, Inc. v. United States (Survival Sys.),* 100 Fed.Cl. 722, 723–24 (2011), listed the date the additional

part of the AR was entered onto the docket, September 8, 2011, as the date of filing.

4. The oral argument held on Friday, October 21, 2011 was recorded by the court's Electronic Digital Recording (EDR) system. The times noted in citations to the oral argument refer to the EDR record of the oral argument.

or agency) of a fixed-price "lowest price technically acceptable" contract to defendant-intervenor, ProActive Technologies, LLC (ProActive). Administrative Record (AR) Tab 16 at 3113; *see generally* Compl. 1, 8.

The USMC issued Solicitation No. M67854–09–R–8005 (Solicitation or Request for Proposal (RFP)) on July 2, 2009, AR Tab 1 at 1, seeking to obtain underwater egress training and maintenance support related to a variety of training devices, such as the Modular Amphibious Egress Trainer (MAET),[5] at four USMC bases: Camp Pendleton in California; Camp Hansen in Okinawa, Japan; Marine Corps Base Hawaii in Kaneohe Bay, Hawaii; and Camp Lejeune in North Carolina, *id.* at 53. The purpose of the training programs and the related devices was to teach Marines "underwater escape and surface water survival using submerged training devices." AR Tab 49 at 4992. The MAET, for example, is an "underwater escape trainer with a generic fuselage section representing specific aircraft/amphibious vessels [sic] cockpit and cabin emergency escape exits," and is used to provide "egress-centric techniques to train combat-configured Marines who may or may not be strong swimmers to develop awareness/skills related to underwater egress and surface water survival skills." AR Tab 33 at 4810.

The Solicitation was initially issued as a best-value, small business set-aside. *See* AR Tab 1 at 100–01. Although four offerors submitted proposals, only three passed the competitive range evaluation, and the agency awarded the contract to ProActive. AR Tab 49 at 4992. This initial award was subsequently protested at the Government Accountability Office (GAO), and the agency voluntarily took corrective action and allowed for re-competition. *Id.*

In August 2010, after re-competition, the USMC notified SSI that it had awarded the contract to DMS International, Inc. (DMS). *Id.* at 4993. A second round of GAO protests ensued. *Id.* Both SSI and ProActive filed

size protests, arguing that DMS had proposed staffing too low to provide satisfactory performance. *Id.* ("The crux of both protestors' arguments was that DMS had proposed to provide so few UET Instructors that its proposal should have been found technically unacceptable."). Following this round of GAO protests, the agency cancelled the award to DMS and again took corrective action. *Id.*

On May 2, 2011, the agency issued Amendment 15 to the Solicitation. *Id.*, AR Tab 16 at 3047. Amendment 15 revised a number of sections in the Solicitation and, in doing so, changed the proposal evaluation criteria in Section M from "best value" to "lowest price technically acceptable." AR Tab 16 at 3113. The revised Section M in Amendment 15 recited:

> Only those offerors determined to be technically acceptable, either initially or as a result of discussions, will be considered for award. Then, price will be evaluated and the proposals will be listed from lowest to highest price based on the total evaluated price. Award will be made to the lowest price technically acceptable proposal.

*Id.*

Amendment 15 also instructed offerors to submit technical proposals that demonstrated the offeror's "recognition and understanding of training requirements" and that detailed the offeror's "maintenance program and program management requirements." *Id.* at 3109 (capitalization omitted). In addition, Attachment 1 to Amendment 15 provides a revised but unsigned Statement of Work (unsigned SOW), *id.* at 3103, 3117, containing a chart and description that specified the number and types of personnel to be provided at each site, *id.* at 3139.

The pricing plans of technically acceptable proposals would then be evaluated on the basis of three factors: (i) total price, (ii) price reasonableness, which is typically established

---

5. The training devices include the Modular Amphibious Egress Trainer (MAET), the Shallow Water Egress Trainer (SWET) and the Submerged Vehicle Egress Trainer (SVET). Administrative Record (AR) Tab 33 at 4810. The court's October 13, 2011 Opinion referred to the training and services requested by Solicitation No. M67854–09–R–8005 (Solicitation or Request for Proposal (RFP)) generally as Modular Amphibious Egress Training or MAET. *Survival Sys.,* 100 Fed.Cl. at 723–24.

by competition, and (iii) unbalanced pricing, that is, whether a contract line item (CLIN) is "significantly over or understated" such that it "may pose an unacceptable risk to the [g]overnment and may be rejected." *Id.* at 3114.

The agency issued a revised Statement of Work (revised SOW) on May 18, 2011. AR Tab 22 at 4255. The revised SOW contained the same minimum staffing requirements specified in the unsigned SOW attached to Amendment 15. *Compare id.* at 4278, *with id.* at 3139.

In response to the amended Solicitation and the revised SOW, SSI, ProActive and DMS submitted revised proposals on May 25, 2011. AR Tab 36 at 4852. Each of the three proposals was evaluated by the Technical Evaluation Team (TET) and each was deemed technically acceptable. AR Tab 33 at 4812–18.

The agency then evaluated each offeror's price proposal according to the three factors—total price, price reasonableness and unbalanced pricing—set out in the amended Solicitation's price evaluation criteria. AR Tab 34 at 4821; *see* AR Tab 16 at 3114. The amended Solicitation noted that, although competition "[n]ormally" establishes price reasonableness, "[i]n limited situations, the [g]overnment will require additional analysis to determine reasonableness." *Id.*

After calculating the total price for all three offerors, the Price Evaluation Team (PET) determined that "a further analysis was warranted to ensure that the lowest bid offeror (ProActive) was reasonable as compared to the other offerors." Add. AR Tab 34E at 4829 E5. In particular, "[t]he Government was concerned about ProActive's significantly lower price based on the average of the competitive range[,] so [in accordance with] FAR 3.501, the Government requested an extensive price analysis to insure ProActive was not attempting to buy-in and, and, after award, anticipate increasing the contract amount." AR Tab 34 at 4822.

The government hired an independent price analyst to address its concerns about ProActive's lower price, particularly ProActive's lower proposed labor costs. *See* Add.

AR Tab 34E at 4829. The independent price analyst attempted to construct an estimate of wage prices that he could compare with ProActive's lower proposed labor costs. *Id.* The independent analyst took as his starting point Department of Labor (DOL) wage rates and added additional factors such as overhead and general and administrative costs that a firm might consider in pricing its services in order to create a fully burdened wage rate. Add. AR Tab 34E at 4829 E6, E8. Using the burdened wage rates to compute a monthly labor cost and applying Hawaii wage rates to Okinawa, Japan, the independent price analyst concluded that "the offeror proposed a realistic rate for the labor rationale for the minimal staffing, DOL WD and training throughput." *Id.* at 4829 E7.

In addition, the PET conducted a price reasonableness analysis by comparing ProActive's pricing to the pricing by other offerors. AR Tab 34 at 4823. The PET stated that it compared the mean prices for "each CLIN in the base year," and concluded that "the unit prices proposed by ProActive are in close proximation with [those proposed by] the other offerors." *Id.* at 4824.

Finally, the PET evaluated ProActive's proposal for unbalanced pricing and concluded that ProActive's price proposal was not unbalanced:

> The Government did not find the price of one or more contract line items to be significantly overstated or understated. Specifically, ProActive did not propose unrealistically high or low prices for the mobilization, the base year, or option years. As a result, the Government did not find ProActive's price proposal to be unbalanced.

*Id.*

At the conclusion of the agency's price analysis, ProActive had the lowest offer, AR Tab 36 at 4857, and the agency awarded the contract to ProActive on July 1, 2011. AR Tab 37 at 4858. On July 21, SSI protested the award to GAO. AR Tab 49 at 4991. GAO dismissed SSI's protest on August 12, 2011, AR Tab 53 at 5071, concluding that "[a] protester's claim that a bidder or offeror submitted an unreasonably low price—or even that the price is below the cost of

performance—is not a valid basis for protest." *Id.*

On August 24, 2011 SSI filed its protest in this court. *See generally* Compl.

## II. Legal Standards

### A. Bid Protest Standard of Review

■ The Tucker Act, as amended by the Administrative Dispute Resolution Act (ADRA), 28 U.S.C. § 1491(b)(1) (2006), confers jurisdiction on this court:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1). The court may "entertain such an action without regard to whether suit is instituted before or after the contract is awarded." *Id.*

■ "A bid protest proceeds in two steps." *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005). In the first step, plaintiff must demonstrate error by showing that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law. *Id.* In the second step, plaintiff must show that the error was prejudicial. *Id.*

#### 1. Plaintiff Must Establish Error

The court reviews a bid protest action under the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir. 2004). The APA provides that an agency's decision is to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bannum,* 404 F.3d at 1351; *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed.Cir.2004); *Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa),* 238 F.3d 1324, 1332 (Fed.Cir.2001); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed.Cir.2000).

Under the arbitrary or capricious standard of review, an agency's decision must be sustained if it has a rational basis. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm),* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts,* 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). The reviewing court may not substitute its own judgment for the agency's, *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856, that is, the question for the court is whether there was a reasonable basis for the agency's actions and not whether the court would have reached the same conclusion as the agency. *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir. 1971))).

■ Under the APA standard of review, as applied in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), and now under the ADRA, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa,* 238 F.3d at 1332.

■ When a challenge is brought on the ground that the contracting officer lacked a rational basis for his decisions, "the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.'" *Fulcra Worldwide, LLC v. United States,* 97 Fed.Cl. 523, 533–34 (2011) (quoting *Impresa,*

238 F.3d at 1332–33). An agency decision should only be set aside if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed.Cir.2009) (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856). When a challenge is brought on the ground that the agency committed a violation of regulation or procedure, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Metro. Van & Storage, Inc. v. United States*, 92 Fed.Cl. 232, 245 (2010) (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973)).

■ Agency actions are entitled to a presumption of "regularity." *Impresa*, 238 F.3d at 1338 (citations omitted). There is a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Savantage Fin. Servs., Inc. v. United States (Savantage)*, 86 Fed.Cl. 700, 703–04 (2009) (citations omitted), *aff'd*, 595 F.3d 1282 (Fed.Cir.2010).

#### 2. Plaintiff Must Establish Prejudice

■ In order to prevail in a bid protest, the plaintiff must demonstrate not only that an error occurred, but also that the error was prejudicial. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996) (citations omitted); *see Alfa Laval Separation, Inc. v. United States (Alfa Laval)*, 175 F.3d 1365, 1367 (Fed.Cir.1999). In the context of a post-award bid protest, "the plaintiff must demonstrate 'substantial prejudice' by showing that there was a 'substantial chance' it would have been awarded the contract but for the agency's error." *Weeks Marine, Inc. v. United States*, 79 Fed.Cl. 22, 35 (2007) (citing *Bannum*, 404 F.3d at 1353), *aff'd in relevant part*, 575 F.3d 1352 (Fed.Cir.2009). If the court finds that there is no error, there is no prejudice and the government's decisions must be left undisturbed. *See Alfa Laval*, 175 F.3d at 1367.

#### B. Motions for Judgment on the Administrative Record

Rule 52.1 of the Rules of the Court of Federal Claims (RCFC) provides for judgment on the administrative record "[w]hen proceedings before an agency are relevant to a decision in a case" before the court. RCFC 52.1(a). RCFC 52.1 does not address the standards and criteria the court will apply in cases decided pursuant to RCFC 52.1 because "[t]he standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases." RCFC 52.1 rules committee note (2006). Accordingly, the standards of review and burdens of proof and persuasion are set by the terms of the applicable substantive law-here, the APA as interpreted and applied in binding precedent. 28 U.S.C. § 1491(b)(4); *see supra* Part II.A.

### III. Discussion

For the following reasons, the court concludes that plaintiff waived its challenge to the agency's technical evaluation of ProActive's proposal, and even if it did not, the agency's technical evaluation was properly conducted. Further, the agency's evaluation of ProActive's pricing proposal for reasonableness and unbalance did not lack a rational basis.

#### A. The Agency's Technical Evaluation

As an initial matter, the court views plaintiff's challenge to the agency's technical evaluation to have been waived because plaintiff failed to challenge the agency's technical evaluation in its Motion. Even if plaintiff's argument were viewed as having been properly raised, the court finds that the agency's technical evaluation complied with the requirements of the Solicitation.

#### 1. Plaintiff Waived Its Challenge to the Agency's Technical Evaluation

■ In its Complaint and in its Reply, plaintiff suggests that ProActive's proposal did not meet the requirement of the Solicitation regarding technical proposals: that the offeror demonstrate an understanding of the

training requirements. *See* Compl. 9; Pl.'s Reply 2. Plaintiff asserts in its Complaint that:

[ProActive] appears to have submitted a proposal based upon substantially fewer personnel/Instructors than are required to provided the required services. Based on [ProActive's] price as reflected in the Award notice and utilizing baseline wage rates as mandated by the Service Contract Act, [ProActive] proposes to staff each of the training sites (including California with significantly greater requirements) with fewer people than the SOW requires.

Compl. 9. And in its Reply, plaintiff contends that "the Agency was required to determine ... from the face of ProActive's written proposal that ProActive understood the staffing requirements of Amendment 15, and demonstrated in its proposal how it proposed to meet those requirements. Absent such a demonstration, the Agency's award was improper." Pl.'s Reply 2. At oral argument, plaintiff again restated its challenge to the agency's technical evaluation of ProActive's proposal. Oral Argument of Oct. 21, 2010, Argument of Mr. Paul Vincent at 10:21:50–53 ("I'm challenging the agency's evaluation of the technical proposal.").

Defendant contends that plaintiff "waived this argument by failing to advance the argument in its moving brief." Def.'s Reply 2. Defendant also argues that ProActive "provid[ed] a sufficiently detailed basis for the agency's conclusion that ProActive's proposal was technically acceptable," *id.* at 5, and that "the agency's evaluation in this case is fully compliant with the solicitation requirements and the [lowest-priced technically acceptable] methodology that was incorporated into the solicitation," *id.* at 6. Defendant-intervenor echoes this argument, contending that "the Agency had a rational basis for its evaluation of ProActive's proposal," Int.'s Reply 2, and specifically contending that "neither the RFP nor Amendment 15" "requires that the offeror price the positions listed as ... Full Time Equivalents [ (FTEs) ]," *id.* at 3.

■ A party's reply brief "repl[ies] to arguments made in the response brief"; it does not provide "the moving party with a new opportunity to present yet another issue for the court's consideration." *Novosteel SA v. United States,* 284 F.3d 1261, 1274 (Fed.Cir. 2002) (emphasis omitted). "The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete." *Arakaki v. United States,* 62 Fed.Cl. 244, 246 n. 9 (2004). In addition, "a party does not waive [or preserve] an argument based on what appears in its pleading; a party waives [or preserves] arguments based on what appears in its brief." *Novosteel SA,* 284 F.3d at 1274.

In this case, plaintiff challenged the agency's technical evaluation of ProActive's proposal in its pleadings—here, its Complaint, *see* RCFC, Rule 7, in its Reply and at oral argument. Compl. 9; Reply 2; Oral Argument of Oct. 21, 2010, Argument of Mr. Paul Vincent at 10:21:50–53. Critically, however, plaintiff failed to raise this challenge in its initial brief moving the court to grant judgment on the administrative record. *See generally* Pl.'s Mot. Instead, in its Motion, plaintiff focused on ProActive's lower price and the adequacy of the agency's price evaluation regarding ProActive's CLIN pricing submissions and total training price. *Id.* at 10–11. In its Motion, plaintiff specifically alleged that the government failed appropriately to analyze ProActive's proposal for unbalanced pricing. *Id.* at 19.

Because a party cannot preserve arguments in its pleadings, reply briefs or arguments made after the close of briefing, plaintiff has waived its challenge to the adequacy of the agency's technical evaluation.

### 2. The Agency Properly Conducted the Technical Evaluation

■ Even if plaintiff were viewed as having preserved its argument that the agency failed adequately to evaluate ProActive's proposal, the court finds that the agency's technical evaluation was properly conducted.

In its most recent briefing, plaintiff argues that the agency relied on "blanket statements" by ProActive to make its award rather than conducting an analysis of ProActive's proposal. Pl.'s Reply 3–5. Defendant argues that "the agency reasonably concluded that ProActive understood the solicitation's

[staffing] requirements," Def.'s Reply 3 (capitalization omitted), and that plaintiff "fails to identify which of the solicitation's material terms and conditions ProActive's proposal failed to meet," *id.* at 4.

Amendment 15 to the Solicitation required that one volume of an offeror's proposal be devoted to technical and management issues. AR Tab 16 at 3109. Each offeror would be evaluated on two factors: (i) "recognition and understanding of training requirements," and (ii) "maintenance program and program management requirements." *Id.* (capitalization omitted). Section L.8 sets forth the details of the technical evaluation factors:

Factor 1: Recognition and Understanding of Training Requirements

Offeror shall describe its approach to demonstrate the knowledge, skills, abilities, and capabilities to accomplish the training and safety requirements contained in the SOW.

Factor 2: Maintenance Program and Program Management Requirements

(a) Maintenance Program—The offeror shall submit a plan detailing the preventive and corrective maintenance checks and services for the MAET, SWET, SVET, hoist, breathing devices, and all associated support equipment. The maintenance plan must describe how the maintenance concept will be implemented, and actions for each significant maintenance task that will be required for the system/equipment during its life cycle. The Offeror shall also submit a comprehensive emergency maintenance plan for the MAET, SWET, SVET, hoist, breathing devices and variations thereof with annual inspections, checks, and servicing, which shall also include risk mitigation in its Safety Assessment Report (SAR) at each site.

(b) Program Management—The Offeror shall provide a management plan detailing the companies [sic] organizational information which demon-

strates their ability to provide corporate support to the sites which include maintenance response times, as well as the ability to acquire additional or replacement personnel to continue uninterrupted operations at each of the sites in accordance with the SOW. The offeror shall describe their plan for mitigating risk and managing its resources in the performance of tasks described under the SOW and a plan for meeting emergency contingencies by showing its ability to acquire additional personnel in support of surge training requirements.

AR Tab 16 at 3109. Given the factors listed above, the agency was then required to assign a rating of either "acceptable" or "unacceptable" to each proposal. *Id.* at 3114.

ProActive's revised proposal, submitted in response to Amendment 15 of the Solicitation, provided the agency with a detailed description of ProActive's understanding of the training requirements and its plans for a maintenance program and for program management. *See generally* AR Tab 26 at 4482–4554. For example, ProActive provided a breakdown of the number of people who would man each site, *id.* at 4503, enumerated the qualifications of key personnel who would be responsible for maintaining equipment and for training the Marines, *id.* at 4506, 4538–4554, and described how personnel would be [* * *] at the site, *id.* at 4504, 4507–08.

Subsequently, the agency "evaluated each offeror's proposal in accordance with the Source Selection Plan ... and assigned an 'acceptable' or 'unacceptable' rating per Section M of the RFP." AR Tab 33 at 4812; *see* AR Tab 28 at 4682–4705. With regard to ProActive's proposal, the TET Report noted that there were no weaknesses or deficiencies, AR Tab 33 at 4814–15; *see* AR Tab 28 at 4682–88, and summarized the results of the TET team members' detailed evaluations [6] of ProActive's proposal in the report,

---

**6.** The evaluation worksheets of members of the Technical Evaluation Team (TET) provide additional support for the conclusion that the agency

conducted a thorough technical analysis and reasonably determined that the ProActive Technologies, LLC (ProActive) proposal was sufficiently

AR Tab 33 at 4814–15. Finally, the Source Selection Decision Document provides a detailed narrative explaining why ProActive's proposal met the requirements of the Solicitation:

> ProActive submitted a detailed maintenance plan, SAR plan, and risk mitigation plan as well as providing specific details of their database that manages inspections, servicing, lubricating, adjusting and replacement of parts [as] quickly as necessary. It was also specifically noted that they provided good detail as to their ability to quickly provide trained resources, already located at each site, in the event of immediate surge requirements.

AR Tab 36 at 4855.

Contrary to plaintiff's allegations, see Pl.'s Reply 3–5, the USMC did not merely rely on blanket statements from ProActive that it intended to meet the Solicitation's requirements, but, instead, conducted a thorough technical analysis and reasonably concluded that ProActive's proposal was sufficiently detailed.

Nor does the record support plaintiff's contention that ProActive's proposal was deficient on its face for failing to meet the staffing requirements outlined in Amendment 15. See Compl. 9. Specifically, plaintiff has failed to demonstrate that ProActive's proposal failed to provide the minimum number of staff listed in the "Minimum Staffing Requirements" chart (reproduced below) that appears in both the unsigned SOW in Amendment 15, AR Tab 16 at 3139, and in the revised SOW, AR Tab 22 at 4278.

The parties' interpretations of the minimum staffing requirement differ. The government and defendant-intervenor argue that the stated minimum staffing requirements do not require that the positions be FTEs. Int.'s Reply 3 (styling plaintiff's FTE requirement as a "self-imposed constraint [p]laintiff used when pricing its proposal"); Oral Argument of Oct. 21, 2011, Argument of Mr. Kenneth Woodrow at 10:52:52–10:53:52 ("My argument, your honor, is that there is nothing in the ... request for proposals that explicitly requires each of these staffing positions to be full time equivalent personnel. And so what ProActive has proposed here, is that it will meet the staffing requirements, it will meet the minimum staffing requirements, but it will do so by [* * *]. In other words, [* * *] at Camp Pendleton. When [* * *]. When [* * *]. So they will meet the [* * *]."). Plaintiff counters that Amendment 15 required "full person-years, each year, for each and every staff position." Pl.'s Reply 6.

The court recognizes that ProActive's approach to staffing—beyond providing the minimum number of staff required by the revised SOW—is not a model of clarity. At one point in its proposal, ProActive described its staffing plan in its technical proposal as follows:

[* * *]

AR Tab 26 at 4504. On the following page, ProActive states "we will staff our sites with full-time employees." Id. at 4505. And in its price proposal, ProActive indicates that its price calculations are based on full-time staffing. See AR Tab 27 at 4601 ("2,080 base man-hours per year (52 weeks × 40 hours/week) minus 80 hours/year for holidays, mi-

detailed. AR Tab 28 at 4682–88; AR Tab 33 at 4811. Regarding Factor 1, recognition and understanding of training requirements, one TET member stated, "The Offeror demonstrates the knowledge of the Underwater Egress Trainers (UET) as described in his Proposal by providing complete descriptions of the systems.... They have the skills, certifications, knowledge, and experience with survival training, water egress training instructors, compressed air operations, dive operations and three level of maintenance to maintain the systems in an operational status." Id. at 4686. Regarding Factor 2(a), maintenance program requirements, the same TET member observed that the "Offeror Maintenance Program consist[s] of a tri-level plan to provide Organiza-

tional, Intermediate, and Depot maintenance to all Underwater Egress Training sites.... The tri-level of maintenance will provide inspections, servicing, lubricating, adjusting, [and] parts replacement calibrating.... They will also have a database for Maintenance Data Collection to assist with preventative maintenance scheduling." Id. at 4687. Regarding Factor 2(b), program management requirements, another team member stated "the Offeror submitted a management plan detailing the company's organizational information, which demonstrated their ability to provide corporate support to improve maintenance response times as well as acquire additional or replacement personnel to continue uninterrupted operations at each site." Id. at 4682.

nus 80 hours/year for paid time off, equals 1,920 man-hours per year net.").

In plaintiff's view, ProActive's price proposal indicates that ProActive planned to provide "different staffing from that required by Amendment 15 and explicitly proposed by both DMS and Survival Systems, i.e. full person-years, each year, for each and every staff position." Pl.'s Reply 6.

However, the revised SOW required only a minimum number of personnel at each site as set forth in the following chart:

| Minimum Staffing Requirements | |
|---|---|
| **Supervising UET Instructor (Site Manager)** DOL Code 15010, title Aircrew Training Devices Instructor (Non-Rated) | Key Personnel (1 per site) |
| **Equipment Maintenance Technician** DOL Code 23182 - Electronics Technician Maintenance II | Key Personnel (1 per site) |
| **UET Instructors** DOL Code 15010, title Aircrew Training Devices Instructor (Non-Rated) | Non Key Personnel Camp Lejeune – 8 Okinawa – 8 Hawaii – 8 Camp Pendleton    16 |

AR Tab 16 at 3139; AR Tab 22 at 4278. An earlier question-and-answer exchange between the agency and the third offeror, DMS, confirms that this chart depicts the minimum number of personnel required at each site. DMS inquired, "Is the table, as presented in Attachment B, representative of the correct minimum number of personnel to be positioned at each site?" and the agency responded "yes." AR Tab 20 at 4177.

Plaintiff does not point out and the court has not been able to find evidence that the amended Solicitation or revised SOW required full-time staff or that ProActive planned to provide fewer than the minimum staff that were required by the amended Solicitation and the revised SOW.

Moreover, because neither the amended Solicitation nor the revised SOW stated a requirement for full-time staff, it would have been improper for the agency to evaluate proposals based on whether they provided full-time staff. FAR § 15.305(a) provides that "[a]n agency shall evaluate competitive proposals and then assess their relative qual-

ities solely on the factors and subfactors specified in the solicitation." FAR § 15.305(a) (2010). Under FAR § 15.305(a), the agency could not have evaluated ProActive's proposal for the provision of full-time staff where that requirement was not contained in the Solicitation. *Cf. Hunt Bldg. Co. v. United States,* 61 Fed.Cl. 243, 273 (2004) ("The agency's failure to follow its own selection process embodied in the Solicitation is . . . a prejudicial violation of a procurement procedure established for the benefit of offerors."). Indeed, even if a part-time staffing plan is insufficient to meet the requirements of the Solicitation, this is a matter to be addressed during performance and not during contract formation. *See SecureNet Co. v. United States,* 72 Fed.Cl. 800, 809–10 (2006) (holding that, although FAR and the solicitation required compliance with Korean labor laws during performance, the likelihood of compliance was not an evaluation factor that should have been considered by the Army, and observing that the issue of the awardee's compliance with Korean labor laws could

only be assessed during actual contract performance).

## B. The Agency's Price Evaluation

█ The agency's price reasonableness analysis and its analysis for unbalanced pricing complied with the requirements of the Solicitation and relevant law.

### 1. Price Reasonableness

Plaintiff argues that the agency's price analysis was inadequate,[7] claiming that "in the two price-reasonableness analyses, the authors simply assumed away, or ignored, the most troubling aspects of ProActive's unexplained pricing." Pl.'s Mem. 14. Plaintiff argues that the agency's conclusion that the offerors were competitively close in price "ignores the fact that ProActive's price for the total period of $19.9 million was roughly [* * *] lower than either Survival Systems' price of [* * *], or DMS' price of [* * *]," id., and that the price evaluation report, see AR Tab 34 at 4819–4829, improperly "assumed some add-ons to wages paid (plus H & W)—an assumed overhead rate, an assumed

[General & Administrative (G & A)] rate, and an assumed profit rate," Pl.'s Mem. 15. Plaintiff also objects to the independent price analyst's assumption that wage rates in Okinawa, Japan were the same as those listed in the Department of Labor Wage Rates for Hawaii, see AR Tab 34 E at 4929 E7, stating that the agency "completely omit[ed] even assumed data with respect to Okinawa," Pl.'s Mem. at 16.[8]

Defendant counters that "the record demonstrates that the agency's independent analysis of ProActive's price was reasonable and consistent with the requirements of the solicitation and the FAR." Def.'s Mot. 13. Specifically, defendant states that the agency was permitted under the FAR to use a " 'comparison of the proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items.' " Id. at 17 (quoting FAR § 15.404–1(b)(2)(ii)). Defendant further asserts that it properly "relied upon data that it possessed from other Government contracts to perform an Independent Analysis of ProActive's pricing," id. at 18, referring to

7. At some places in its briefing, plaintiff appears to argue that the agency should have conducted a cost realism analysis under FAR § 15.404–1(d). See, e.g., Pl.'s Mem. 13 (arguing that "the Agency arbitrarily chose to 'assume' that if ProActive were awarded the contract at its extraordinarily low price, ProActive planned to, and could, provide all the services required by the Agency under the terms of Amendment 15"); cf. Tech Sys., Inc. v. United States, 98 Fed.Cl. 228, 264 (2011) (stating that although plaintiff did not argue that the agency was required to conduct a price realism analysis, plaintiff's argument that the agency "fail[ed]" to address how a company lacking the organization, experience, and resources of the incumbent could offer a price [XX]% lower than the incumbent" essentially challenged the absence of a price realism analysis (internal quotations omitted) (brackets in original)). However, in its Reply, plaintiff explicitly disclaims reliance on the argument that the agency acted unreasonably in failing to conduct a price realism analysis. Pl.'s Reply 2. The Solicitation did not require the agency to perform a price realism analysis; rather, it contemplated price analysis only for reasonableness and unbalanced pricing. See AR Tab 16 at 3114.

8. Plaintiff also appears to argue in its briefing that ProActive was required to submit a detailed breakdown as to how its labor pricing was built up. See Pl.'s Mem. 10 ("[T]he Solicitation requested [offerors to] provide[] complete breakdowns as to how their labor pricing was built up,

beginning with the mandated pay rates, through the additional of labor fringes, the Other Direct Costs (supplies for each site), overhead, [General & Administrative (G & A)], and profit...." (internal citation omitted)). Plaintiff's counsel clarified at oral argument that it is not plaintiff's position that the Solicitation required the submission of detailed cost or pricing elements. Oral Argument of Friday, Oct. 21, 2011, Argument of Mr. Paul Vincent at 10:41:17–24 ("We agreed that the RFP did not tell offerors that they had to submit detailed build up of their hourly prices."). The Solicitation states that "[p]roposals will be evaluated on the basis of total price for all items listed in Section B excluding travel and over-and-above costs." AR Tab 16 at 3109. Offerors were "encouraged," but not required, "to provide any applicable pricing support." Id. at 3114. Even if plaintiff had continued to press this argument, it could not have prevailed because the Solicitation did not require the submission of detailed cost or pricing data. See AR Tab 16 at 3109 (stating that "[p]roposals will be evaluated on the basis of total price for all items listed in Section B excluding travel and over-and-above costs"); AR Tab 1 at 2–39 (listing the Section B items and requiring, for example, only that the offeror provide the "unit price," "amount" and "net amt" for twelve monthly units of "MAET Training" at Camp Pendleton in California) (capitalization omitted).

the agency's use of prior contract data to estimate ProActive's overhead, G & A and profit factors, *id.* at 18–19. Defendant-intervenor also argues that "[t]he agency not only complied with the requirement to examine the reasonableness of proposed prices, it also took extra steps to ensure ProActive's proposal complied with the requirements in the RFP," including performing an extensive price analysis. Int.'s Mem. 7.

In evaluating the reasonableness of the agency's evaluation of ProActive's price proposal, the court looks first to the terms of the Solicitation and the requirements of the FAR. With regard to price evaluation, the Solicitation states that:

Price proposals will be evaluated for total price in the following format:

a. Total Price. The price of all FFP items (including all options) will be totaled to determine the total price for evaluation consideration.

b. Reasonableness. Normally, competition establishes price reasonableness. In limited situations, additional analysis will be required by the Government to determine reasonableness. Offerors are encouraged to provide any applicable pricing support.

AR Tab 16 at 3114.[9]

Section 15.404–1 of the FAR provides guidance to the contracting officer conducting a price reasonableness analysis. It states that "[t]he contracting officer is responsible for evaluating the reasonableness of the offered prices," FAR § 15.404–1(a)(1), and specifies the techniques that the contracting officer may use to "ensure that the final agreed-to price is fair and reasonable," FAR § 15.404–1(a). FAR § 15.404–1(a)(2) states that an agency must perform a price analysis when "certified cost or pricing data are not required." The FAR also permits

the agency broad discretion to conduct that analysis in an appropriate manner. *See* FAR § 15.404–1(b)(2); *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 733 n. 8 (2000) (noting that "the Government has discretion in choosing which of several acceptable price analysis methods to employ"). More specifically, FAR § 15.404–1(b)(2) provides, in relevant part:

The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

(i) Comparison of proposed prices received in response to the solicitation. Normally, adequate price competition establishes a fair and reasonable price (see 15.403–1(c)(1)).

(ii) Comparison of the proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items. This method may be used for commercial items including those "of a type" or requiring minor modifications.

FAR § 15.404–1(b)(2)(i)–(ii). Under the FAR, a price is based on adequate price competition if:

(i) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement and if–

(A) Award will be made to the offeror whose proposal represents the best value (see 2.101)[10] where price is a substantial factor in source selection; and

(B) There is no finding that the price of the otherwise unsuccessful offeror is unreasonable. Any finding that the price is unreasonable must be supported by a statement of the facts and approved at a level above the contracting officer[.]

---

9. A portion of the price evaluation criteria which refers to unbalanced pricing is omitted here. "Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques." FAR § 15.404–1(g) (2010). The agency's analysis for unbalanced pricing is discussed in Part III.B.2, *infra.*

10. It is also proper to find adequate price competition "when the RFP provides for award on the basis of the 'lowest-priced, technically acceptable offer,'" such as the RFP in this case. John Cibinic, Jr. et al., *Formation of Government Contracts* 1454 (4th ed. 2011).

FAR § 15.403–1(c)(1)(i) (2010) (footnote added).

In this case, the agency did not require certified cost and pricing data.[11] *See* AR Tab 16 at 3109 (requiring, as part of an offeror's price proposal, "Price Proposal Section B Spreadsheets" and stating that "[p]roposals will be evaluated on the basis of total price for all items listed in Section B excluding travel and over-and-above costs"); AR Tab 1 at 2–29 (listing the Section B items alongside blank spaces for offerors to provide information only as to "unit price," "amount" and "net amt") (capitalization omitted). Therefore the agency was required to undertake a price analysis pursuant to FAR § 15.404–1(a)(2). Consistent with the terms of the Solicitation and the FAR, which state that "[n]ormally, competition establishes price reasonableness," AR Tab 16 at 3114; *see* FAR § 15.404–1(b)(2)(i), the agency determined that "[t]he Government received a sufficient number of price proposals for competition so there is no need to perform a more thorough analysis (certified cost and pricing data) concerning cost elements beyond what is required in *Section M of the RFP*," AR Tab 34 at 4821. Three competitive offerors submitted price proposals: DMS, Survival Systems, and ProActive. AR Tab 36 at 4852. The agency determined that all three offerors submitted technically acceptable proposals, a determination that must be based on a finding that the offerors were responsible, *see* AR Tab 33 at 4812, and that their offers satisfied the agency's requirements, *id.* at 4818 ("Overall, all proposals met the technical acceptability criteria. . . ."). The agency then determined "price reasonableness based on a comparison [of each offeror's total evaluated price] to the mean of all the proposed prices," AR Tab 34 at 4821, and determined that all offerors' prices were reasonable, *id.* at 4824, 4826, 4828.

The terms of the amended Solicitation and the relevant FAR provisions permitted the USMC to determine, despite a [* * *] difference in price, *see id.* at 4821, that there was adequate price competition. The agency's determination that there was adequate price competition is therefore dispositive, and Plaintiff's argument that the agency improperly "ignore[d] the fact that ProActive's price for the total period of $19.9 million was roughly [* * *] lower than either Survival Systems' price of [* * *], or DMS' price of [* * *]," Pl.'s Mem. 15, lacks merit.

If the government—as, in the court's view, it was entitled to do under FAR § 15.404–1(b)(2)—had stopped at the conclusion that there was adequate price competition, there would be nothing more for the court to decide on the question of price reasonableness. However, notwithstanding its determination that there was adequate price competition, the agency "was concerned about ProActive's significantly lower price based on the average of the competitive range so . . . the Government requested an extensive price analysis to insure ProActive was not attempting to buy-in and, after award, anticipate increasing the contract amount." AR Tab 34 at 4822. The majority of plaintiff's arguments with regard to the agency's price analysis concern this second step, Pl.'s Mem. 14–16, in which the agency's independent price analyst attempted to reverse engineer ProActive's labor prices to determine whether they were reasonable for the work to be performed, *see generally* Add. AR Tab 34E. Specifically, plaintiff argues that, in evaluating ProActive's labor pricing, the agency improperly assumed rates for overhead, G & A and profit based on prior contracts between the government and ProActive. Pl.'s Mem. at 15. Plaintiff also argues that it was improper for the agency to "assume that the rates used in Hawaii were also applied to Okinawa." *Id.* at 16 (internal quotation marks omitted). The government contends that the prior contracts were "similar" under FAR § 15.404–1(b)(2)(ii), Def.'s Mot. 17–18, and therefore it was permitted to rely upon "data that it possessed from other Government contracts to perform an Independent Analysis of ProActive's pricing," *id.* at 18; *see* Oral

---

11. The agency's request for certified cost or pricing data would have appeared in Section L of the amended Solicitation. FAR § 15.204–5. Neither plaintiff nor ProActive appears to have submitted a "Certificate of Current Cost or Pricing Data" as described in FAR § 15.406–2(a). *See generally* AR Tab 25; AR Tab 27.

Argument of Friday, Oct. 21, 2011, Argument of Mr. Kenneth Woodrow at 11:03:33–48.

FAR § 15.404–1(b)(2) permits the government discretion in its choice of method to determine price reasonableness. Specifically, FAR § 15.404–1(b)(2)(ii) gives the government the option to use a "[c]omparison of the proposed prices to historical prices paid, whether by the Government or other than the Government, for the *same or similar* items" in order to determine price reasonableness. FAR § 15.404–1(b)(2)(ii) (emphasis added).

The prior ProActive contracts upon which the agency relied to calculate estimated overhead, G & A and profit factors—and which are documented as three spreadsheets in the record, Add. AR Tab 34B; Add. AR Tab 34C; Add. AR Tab 34D—constitute "historical prices paid" by the government within the meaning of FAR § 15.404–1(a)(2)(ii), and plaintiff does not contend otherwise. Plaintiff instead argues that the prior ProActive contracts upon which the agency relied should not be viewed as contracts for "the same or similar items." *See id.* For example, plaintiff points out that in one of the prior contracts, ProActive's mobilization price was much lower ([* * *]) than its [* * *] mobilization price in this case. Pl.'s Reply 11; *see also* Add. AR Tab 34C (Camp Lejeune spreadsheet) (listing a mobilization price of [* * *]); AR Tab 34 at 4823 (listing ProActive's total evaluated price for mobilization as [* * *]). Plaintiff also points out that in another contract, the mobilization-to-labor price ratio was significantly higher: a ratio of approximately [* * *] rather than the ratio of approximately [* * *] in this case. Pl.'s Reply 11; *see also* Add. AR Tab 34D (Camp Lejeune IIT spreadsheet) (providing support for a mobilization-to-labor price ratio in a prior ProActive contract of approximately [* * *]); AR Tab 34 at 4823–24 (providing support for a mobilization-to-

labor price ratio in the MAET contract of [* * *]).

However, the record also provides evidence that the positions listed in the spreadsheets sufficiently support the government's contention that the contracts were similar within the meaning of FAR § 15.404–1(b)(2)(ii). *See* Oral Argument of Friday, Oct. 21, 2011, Argument of Mr. Kenneth Woodrow at 11:03:33–48 ("There were labor categories, that, while not precisely congruent to underwater training instructors, were more similar than just saying it was a maintenance contract and these were maintenance workers."). For example, all three spreadsheets list the following positions: Program Manager, Program Administrator, Purchasing Support, HR Manager, Contracts Manager, Site Manager and General Maintenance Worker. Add. AR Tab 34B (Camp Pendleton spreadsheet); Add. AR Tab 34C (Camp Lejeune spreadsheet); Add. AR Tab 34D (Camp Lejeune IIT spreadsheet). Two of the three prior contracts included one or more positions for an electrical technician,[12] Add. AR Tab 34C (Camp Lejeune spreadsheet); Add. AR Tab 34D (Camp Lejeune IIT spreadsheet), and one of the prior contracts also provided for a computer operator, Add. AR Tab 34D (Camp Lejeune IIT spreadsheet).

The positions listed in the revised SOW for the MAET contract include "a Supervising Underwater Egress Instructor who will serve as the site manager and foreman[,] . . . . an Equipment Maintenance Technician. . . . [and] a designated amount of UET Instructors." AR Tab 16 at 3135. These positions appear reasonably comparable to the Site Manager, Electrical Technician and computer simulation training technicians listed in the spreadsheets relied on by the government. *See* Add. AR Tabs 34B–34D. More importantly, the spreadsheets repre-

---

12. The Camp Lejeune spreadsheet contains a position entitled "Elect. Tech., Maint. II.," Add. AR Tab 34C, and the Camp Lejeune IIT spreadsheet includes positions titled TVCS Lead ET III PH–1 and TVCS Tech ET II PH–1, Add. AR Tab 34D. At oral argument, defendant referred to both the TVCS Lead ET III PH–1 and the TVCS Tech ET II PH–1 positions as "technician[s]." Oral Argument of Friday, Oct. 21, 2011, Argument of Mr.

Kenneth Woodrow at 11:02:33–42 (reciting some of the positions listed under the labor category for the Camp Lejeune IIT and Avatar support contract as "a Lead ET, which is a technician; a computer operator, another technician; and a general maintenance worker"). The court is unable to find a more detailed description of these positions in the record.

sent contracts between ProActive and the government that were to be performed at two of the same bases (Camp Pendleton and Camp Lejeune), *see id.,* where MAET training must be provided under the Solicitation, *see generally* AR Tab 1. The court cannot conclude that the agency acted irrationally in relying on this historical data in estimating ProActive's overhead, G & A and profit factors.

Plaintiff's final price reasonableness argument attacks the independent price analyst's assumption that wage rates in Hawaii could be applied to Okinawa, Japan. Pl.'s Mem. 16 (criticizing the independent analyst's report, AR Tab 34E at 4929 E7, for "arbitrarily suggest[ing] [that] the Government should 'assume' that 'the rates used in Hawaii were also applied to Okinawa,'" despite a [* * *]); *id.* at 20 (stating that "although the Government had no backup pricing information for Okinawa, it 'assumed' that ProActive was using the same burden and build up rates as it had used for figures in Hawaii"). The court is not in a position to second-guess the independent analyst's decision to assume that wage rates were the same in Okinawa, Japan as in Hawaii rather than to examine government contract wage data regarding the provision of training services at Japanese bases. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion," *Honeywell,* 870 F.2d at 648. The court must not substitute its own judgment for the agency's. *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856. Moreover, as the government suggested in briefing and at oral argument,

employees in Japan are not covered by the Service Contract Act (SCA), while employees in Hawaii are covered by the SCA, *see* 41 U.S.C. §§ 351, 357,[13] so the independent price analyst's assumption may well have been a conservative one, Def.'s Mot. 19 ("Because Okinawa, Japan is not under Department of Labor jurisdiction, the analysis assumed that [the rates in Okinawa] were the same as [in] Hawaii."); Oral Argument of Oct. 21, 2011, Argument of Mr. Kenneth Woodrow at 11:04:42–11:05:02 ("The Japan prices did not require the Service Contract Act, so those weren't set at a particular amount, and second, the agency assumed that the Hawaiian prices ... would be applicable to Japan, and so we believe that's a conservative assumption."). If anything, ProActive may have been able to obtain labor in Japan at lower wage rates than in Hawaii because the Japanese labor rates were not covered by the SCA.

## 2. Unbalanced Pricing

Plaintiff argues that ProActive's price was unbalanced and that the agency failed adequately to consider the risks associated with ProActive's proposal as required by FAR 15.404–1(g) and the RFP.[14] *See* Pl.'s Mem. 17–21. Defendant contends that the agency reasonably concluded that ProActive's proposal was not unbalanced because ProActive "did not propose unrealistically high or low prices for the mobilization, the base year, or option years of the contract." Def.'s Mot. 22–23.

Both FAR § 15.404–1(g) and the Solicitation required the agency to evaluate for un-

---

**13.** The Service Contract Act (SCA) applies to:
[e]very contract (and any bid specification therefor) entered into by the United States or the District of Columbia in excess of $2,500, except as provided in section 356 of this title, whether negotiated or advertised, the principal purpose of which is to furnish services in the United States through the use of service employees....
41 U.S.C. § 351(a) (2006). However, the SCA excludes foreign bases from the definition of the "United States" when the term is used in the geographical sense. 41 U.S.C. § 357(d).

**14.** Plaintiff also relies on *Al Ghanim Combined Group Co. General Trading & Contracting W.L.L. v. United States (Al Ghanim),* 56 Fed.Cl. 502

(2003), for the proposition that the agency was required to conduct a "CLIN–by–CLIN analysis" of ProActive's price proposal before it could conclude that ProActive's prices were balanced, Pl.'s Reply 8–9. Plaintiff's reliance on *Al Ghanim* is misplaced. As the court has observed previously, *Al Ghanim* "involved unbalanced contract line item pricing in an indefinite delivery/indefinite quantity ('ID/IQ') contract .... in which a contractor could subsequently attempt to recoup losses [from the government] incurred from buying in," *First Enter. v. United States,* 61 Fed.Cl. 109, 125 n. 26 (2004), which is unlike the ordinary fixed-price services contract at issue in this case.

balanced pricing. FAR § 15.404–1(g)(2) requires that "[a]ll offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced." FAR § 15.404–1(g)(2). Under FAR § 15.404(g)(1), "Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques." *Id.* at § 15.404–1(g)(1). According to the FAR, "The greatest risks associated with unbalanced pricing occur when—(i) Startup work, mobilization, first articles, or first article testing are separate line items; [or] (ii) Base quantities and option quantities are separate line items." *Id.* at § 15.404–1(g)(1)(i)–(ii).[15] And FAR § 15.404–1(g)(1) expressly contemplates the evaluation of unbalanced pricing "by the application of cost or price analysis techniques." *Id.* at § 15.404–1(g)(1).

With respect to unbalanced pricing, the Solicitation largely follows the language of FAR § 15.404–1(g), stating in relevant part:

Proposals will be analyzed to determine if the prices are materially unbalanced. Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of price analysis techniques. An unbalanced offer may pose an unacceptable risk to the Government and may be rejected.

AR Tab 16 at 3114. The Solicitation required that offerors submit unit prices, amount and "net amt" information for the numerous separate line items. *See* AR Tab 1 at 2–39. It lists mobilization as a separate line item, CLIN 0001, *see* AR Tab 1 at 2, and lists separate CLINs for the base years, *see id.* at 2–9, and for each of four option years, *see id.* at 10–39.

The Price Evaluation Report, AR Tab 34 at 4824, the Proposal Analysis Report, AR Tab 35 at 4844, and the Source Selection Decision Document, AR Tab 36 at 4856,

make clear that the agency evaluated ProActive's pricing for unbalance. The Price Evaluation Report and the Proposal Analysis Report both state:

In accordance with FAR 15.404–1(g), the Government evaluated ProActive's proposal for unbalanced pricing. The Government did not find the price of one or more contract line items to be significantly overstated or understated. Specifically, ProActive did not propose unrealistically high or low prices for the mobilization, the base year, or option years. As a result the Government did not find ProActive's price proposal to be unbalanced.

AR Tab 34 at 4824; AR Tab 35 at 4844.

The underlying documentation for the agency's conclusion with regard to unbalanced pricing, however, is not contained in the AR. Oral Argument of Oct. 21, 2011, Argument of Mr. Kenneth Woodrow at 11:07:49–58 ("The unbalanced pricing analysis is not set forth as such in other places in the administrative record that I've been able to find...."). However, as defendant correctly noted at oral argument, *id.* at 11:08:00–44, the FAR does not require that the agency set out a separate analysis specifically for unbalanced pricing and instead permits an agency to rely on cost or price analysis techniques, *see* FAR § 15.404–1(g)(1).

The court concluded in Part III.B.1, *supra,* that the agency's price analysis was reasonable. It was also reasonable for the agency to rely on this analysis, as permitted by FAR § 15.404–1(g)(1), to conclude that ProActive's price was not unbalanced. The Price Evaluation Report compares the offered prices of all three offerors regarding Mobilization (CLIN 0001), base year MAET training at all four locations (CLINs 1001–1004), preventative maintenance at all four locations (CLINs 1005–1008), Intermediate Passenger Helicopter Aircrew Breathing Device (IPHABD) and Survival Egress Air (SEA) Repair and Refurbishment (CLINs 1009–1012). AR Tab 34 at 4823; *see* AR Tab 1 at 2–7. In the Price

15. The third risk listed in FAR § 15.404–1(g)(1) is inapplicable here because it concerns indefinite delivery contracts. *See* FAR § 15.404–1(g)(1)(iii) (noting that one risk associated with unbalanced pricing occurs when "[t]he evaluated price is the aggregate of estimated quantities to be ordered under separate line items of an indefinite-delivery contract").

Evaluation Report, the agency focuses on two of the price areas—mobilization and base quantities—identified in the FAR as those most likely to lead to the greatest risk to the government. AR Tab 34 at 4823; FAR § 15.404–1(g)(1)(i)–(ii) (2010).

There is no separate documented analysis for unbalanced pricing included in the AR. However, the reasonableness of the agency's statement that it evaluated for unbalance, AR Tab 34 at 4824; AR Tab 35 at 4844, together with the record of the agency's price analysis, in which the agency specifically compared ProActive's price for mobilization with its prices for services during the base year and compared the sum of ProActive's "base year and mobilization costs" to the price of its option year services, AR Tab 24 at 4822–23 (capitalization omitted), support the agency's conclusion that it "did not find ProActive's price proposal to be unbalanced," AR Tab 34 at 4824; AR Tab 35 at 4844.

### IV. Conclusion

Based on the foregoing, plaintiff's Motion is DENIED, and defendant's Cross–Motion and defendant-intervenor's Cross–Motion are GRANTED. The Clerk of the Court shall enter judgment for defendant.

IT IS SO ORDERED.